748 So.2d 574 (1999)
Troy MARTIN, individually and on Behalf of Zachary Cane Dupont, minor, Plaintiff-Appellee,
v.
Donna DUPONT, Defendant-Appellant.
No. 32,490-CA.
Court of Appeal of Louisiana, Second Circuit.
December 8, 1999.
*575 David S. Williams, Shreveport, Counsel for Appellant.
Wayne E. Webb, Shreveport, Counsel for Appellee.
Before WILLIAMS, GASKINS and PEATROSS, JJ.
GASKINS, J.
Donna Dupont, the mother of Zachary Cane Dupont, appeals from a trial court judgment awarding custody of her son to a nonparent, Troy Martin, the man she led to believe was the boy's father. She contends that the evidence does not support a finding that the child would be at risk of "substantial harm" if his custody was awarded to her. We affirm the judgment of the trial court.

FACTS
On May 16, 1997, Troy Martin filed a petition for determination of paternity and related custody matters. He asserted that he and Donna Dupont were the parents of an illegitimate child, Zachary Cane Dupont (DOB 6/22/94). He alleged that Ms. Dupont had represented to him and others that he was the child's father and that they had shared custody of the child. She refused to list him as the father on the child's birth certificate; however, she accepted the $50 in weekly child support which Mr. Martin voluntarily paid her.
In his petition, Mr. Martin alleged that Ms. Dupont's live-in boy friend was a violent person who had choked Zachary's maternal grandmother until she passed out and held up a dog by its collar while instructing the child to beat the animal. He also asserted that drugs were used and sold in Ms. Dupont's household, creating a dangerous environment for the child. The court signed an ex parte order granting Mr. Martin provisional custody of the child pending further order of the court.
At a hearing on July 31, 1997, the results of the paternity test were received; they excluded Mr. Martin as the biological father. Temporary custody of the child was granted to Ms. Dupont.
Trial was held on September 22, 1997, before Judge Fred Sexton sitting pro tern. In addition to his own testimony, Mr. Martin presented that of James Martin, his father; Beverly Ann Hubbs, the maternal grandmother; Lorrie Bosley, a friend of Ms. Hubbs; and Christy Darner, Mr. Martin's fiancee. The parties stipulated that the testimony of Mr. Martin's mother, Donna Martin, would be repetitious of his father's testimony. Ms. Dupont testified on her own behalf.
According to the testimony of Mr. Martin and his father, they were led to believe from the time of the child's birth that Mr. Martin was the father. In fact, Mr. Martin testified that Ms. Dupont contacted him when she was in labor and told him to come to the hospital immediately if he wanted to see "his" child born. He and Ms. Dupont's mother were present at the birth. For her part, Ms. Dupont admitted that she and Mr. Martin had a sexual relationship but asserted at trial that she was already pregnant when it began and that he was aware of her pregnancy. Although she admitted calling him while in labor, she purported to be surprised when he came up to the hospital for the child's birth. She also testified that he and her *576 mother were present in the delivery room without her permission.
The maternal grandmother, who conceded that she had a history of psychiatric illness, testified about her troubled relationship with her daughter and her fears for the safety of her grandson. Although her testimony was frequently confused, many of the disturbing incidents she recounted were corroborated by her best friend, Ms. Bosley. In particular, they testified about Ms. Dupont's live-in boy friend, Waylon Ray McGaha, an ex-convict. They testified that Mr. McGaha tried to force the child to drink whiskey while declaring that he intended to teach the child "to drink like a man and fight like a motherfer." On another occasion, according to Ms. Bosley, he held a neighbor's dog in the air by its collar and tried to induce the child to hit the animal. The women, who briefly lived next to the mother, testified that while Ms. Dupont and Mr. McGaha slept until early afternoon, the child would wander out of their house half-dressed and come next door to seek food. On one occasion, Ms. Bosley went into their house to ask Ms. Dupont if she needed anything from the store and surprised Ms. Dupont and Mr. McGaha having sex while the child slept in the same bed. On another occasion, Ms. Bosley found pornographic photographs of Ms. Dupont and Mr. McGaha in an area accessible to the child.
Mr. Martin and his witnesses testified that since the child's birth, he and Ms. Dupont had been sharing custody of the child. The Martins picked up the child around Thursday of every week and kept him until Sunday or Monday.[1] Additionally, Mr. Martin voluntarily paid child support of $50 a week; initially his parents contributed half of these payments. Because Ms. Dupont could not cash a check due to her lack of a bank account or identification, they paid her in cash; according to the Martins, Ms. Dupont's permission for them to see the child was contingent upon her receipt of these funds. Ms. Dupont denied that she shared custody of the child, admitting only that the child stayed with the Martin family several weekends. She also denied receiving child support from Mr. Martin.
Mr. Martin testified that at the age of only two, the child displayed grossly inappropriate sexual behavior toward women. Like Ms. Hubbs and Ms. Bosley, the Martins testified that Ms. Dupont's residence was frequently filthy, with cats and dogs roaming the house, and that she often had little or no food in the house. In one place where she and the child lived, she had no refrigerator and no gas service. Although Ms. Dupont testified that she was employed in cleaning and child care and that Mr. McGaha was a painter, the other witnesses testified that neither of them worked. Mr. Martin testified that Ms. Dupont was engaged in the sale of illegal drugs.
Several witnesses testified that they feared for the child's safety because Ms. Dupont refused to keep a large snake away from him. A photo of the child with the snake draped around his neck was admitted into evidence; Mr. Martin's father testified that Ms. Dupont showed the photo to his wife in an attempt to upset her after his wife repeatedly urged Ms. Dupont to keep the snake away from the child. He also testified as to other conduct by Ms. Dupont and Mr. McGaha which seemed to be designed to shock. On one occasion, they brought to the Martin residence two hitchhikers who they had picked up and kept overnight. On another, Mr. McGaha told the Martins how he would like to shoot one of their cows and watch it bleed to death.
*577 The evidence showed that Mr. Martin had a misdemeanor criminal history. He had a conviction for negligent injury for stabbing someone in a fight as a teenager; the original charge was attempted second degree murder. He also had a few convictions for marijuana possession. However, at the time of trial, he was employed and engaged to be married in one month to a surgical technology intern. He credited his fiancee with helping him to give up the use of marijuana.
The testimony also showed that while she had no drug charges, Ms. Dupont had been arrested for simple battery several times and she had had no driver's license for three years due to her traffic violations. She admitted never having paid income taxes despite her claims of employment. She also admitted being in a mental institution for nine months as a teenager, but asserted that her mother had institutionalized her out of spite because she kept running away from home. As to the actual paternity of the child, she testified that she did not know who the father was but that there were five possible candidates. As to her relationship with Mr. McGaha, she testified that she had known him for eight years. They had a sexual relationship for eight months when she was 16 or 17. They had resumed their relationship two years ago. While she described him as one of her "very best friends," she claimed that they had stopped seeing each other the previous month.
At the conclusion of evidence, the trial court found that the then three-year-old child would be threatened with substantial harm if his custody was awarded to his mother. The court found that the mother's conduct showed a "pattern of irresponsibility" and "a pattern of destructive behavior that has a substantial significant chance of continuing, having a significant chance of resulting in substantial harm to the child." In particular, the trial court stated that it did not believe that Mr. McGaha was gone and that he was "a bad influence" on the mother and "a terrible influence" on the child. The court observed that the mother's long-term relationship with this man displayed "enormous bad judgment." Also, the court specifically found credible the testimony about the pornographic photos, the whiskey drinking incident, and the dog abuse incident. The court also credited the accounts given by Mr. Martin's father of the incidents with the snake and with the hitchhikers; while minor, these tended to show Ms. Dupont's poor judgment. The court was further concerned by the evidence of the child's "strange behavior" around women and the lack of food in the mother's home. Although the court expressed some reservations about Mr. Martin's abilities, it appeared to be favorably impressed by his parents and his future wife.
Thus, the court granted custody to Mr. Martin and awarded the mother reasonable visitation rights. Ms. Dupont was specifically ordered not to have any contact with or expose the child to Mr. McGaha while exercising visitation. Although no child support was awarded, Mr. Martin's right to seek such from Ms. Dupont was recognized and preserved. Judgment in conformity with the court's ruling was signed February 19, 1998, filed on March 5, 1998, and mailed to counsel on April 15, 1998.
On April 17, 1998, Mr. Martin filed a petition for child support, modification of custody, and contempt proceedings. He alleged that the mother had violated the prior court order by exposing the child to Mr. McGaha. He requested that she be held in contempt and that her visitation rights be supervised. On April 16, 1998, the court directed that the mother's visitation be supervised under C.C.P. art. 3945.
On April 22, 1998, Ms. Dupont filed a motion for new trial complaining of the custody award to a nonparent and alleging that Mr. Martin had admitted falsifying his testimony to gain custody. On May 22, 1998, she also filed a rule for contempt and *578 to change custody. She claimed that Mr. Martin had failed to allow visitation, that he had not assumed responsibility for the child's medical and dental health, and that the child was not residing with him.
On July 16, 1998, a hearing was held on the motion for new trial before Judge Charles Adams. In an interim order, the mother was directed to pay child support of $150 per month, effective July 1, 1998. Supervised visitation was terminated, and the prior unsupervised visitation was reinstated. On December 9, 1998, the trial court signed a judgment denying the mother's motion for new trial. Judge Adams stated that, after a careful review of the record, he believed Judge Sexton's custody award was correct.
The mother appeals from the 1997 custody award.

LAW
In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. Tennessee v. Campbell, 28,823 (La.App.2d Cir.10/30/96), 682 So.2d 1274.
La. C.C. Art. 133 governs custody awards to nonparents. It provides:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child, and that the best interest of the child requires an award of custody to the nonparent. Tennessee v. Campbell, supra.
In a child custody case, the determination of the trial judge will not be disturbed absent a clear showing of abuse of discretion. Draper v. Draper, 556 So.2d 210 (La.App. 2d Cir.1990); Wyatt v. White, 626 So.2d 816 (La.App. 2d Cir.1993). The trial judge had the opportunity to see and hear the witnesses and to evaluate their sincerity and credibility. Hughes v. McKenzie, 539 So.2d 965 (La.App. 2d Cir. 1989), writ denied, 542 So.2d 1388 (La. 1989). The trial judge is in a better position to evaluate the credibility of witnesses and the weight of evidence than an appellate court, which does not hear or see the witnesses. For this reason, a reviewing court should adopt the trial court's finding as its own in the absence of clear error, even if other conclusions from the same evidence were equally reasonable. Goodwin v. Goodwin, 618 So.2d 579 (La.App. 2d Cir.1993), writ denied, 623 So.2d 1340 (La. 1993). An appellate court is required to extend great weight to the factual conclusions of trial courts which are based on reasonable evaluations of credibility and reasonable inferences of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989).

DISCUSSION
Ms. Dupont contends that the trial court erred in finding that the child, now five years old, would face substantial harm in her custody. She maintains that the most compelling evidence against her much of it supplied by her mother and Ms. Bosleywas not believable. Specifically, she argues that the trial court's conclusion that these two women were credible witnesses was unreasonable given her mother's history of mental illness and Ms. Bosley's admission that she had once allowed Ms. Hubbs to use her health insurance card to secure treatment when critically ill. However, we note that the trial court, who personally observed the witnesses and their demeanor, was in a much better position to evaluate their credibility than this court, which reviews a "cold" record. An examination of the record reveals that the trial court was fully cognizant of the *579 grandmother's mental health frailties and the friendship between these women. Nonetheless, it found them to be credible witnesses.[2] Our review reveals no manifest error in this finding, and we will not disturb the credibility determinations of the trial court.
On the issue of substantial harm, Ms. Dupont claims that if the trial court was concerned about Mr. McGaha being around Zachary, it could have awarded custody to her on the condition that she not associate with him. In support of this argument, Ms. Dupont points to the provision in the child custody and visitation plan which ordered her to not expose the child to Mr. McGaha during visitation. She also maintains that even the testimony of Mr. Martin indicated that she adequately cared for the child before she resumed her relationship with Mr. McGaha.[3]
The trial court heard Ms. Dupont's testimony that her sexual relationship with Mr. McGaha had terminated; however, the trial court bluntly stated that it did not believe that this man was, in fact, removed from the picture. Given the trial court's belief that the mother was not truthful in her testimony that she was no longer involved with Mr. McGaha, it obviously lacked confidence that she would abide by a directive to permanently disassociate from him. The trial court was not required to first issue a vain and futile order as a prerequisite to removing the child from the mother's custody where sufficient, credible evidence of the threat of substantial harm to the child had been produced at trial. The court was not required to place the child at additional risk in the hope that Ms. Dupont would stay away from Mr. McGaha.
Ms. Dupont also argues that the trial court did not give enough consideration to Mr. Martin's criminal record and history of drug use and that it was unduly swayed by its favorable impression of Mr. Martin's parents. The record reveals that Mr. Martin's past was far from stainless. He had a criminal record that included marijuana possession and assaultive behavior. However, the trial court found that an award of custody in his favor was in the best interest of the minor child. We find no manifest error in such a determination. While Mr. Martin's past conduct was, in several respects, undesirable, he had made many important inroads in improving and stabilizing his life. He was gainfully employed and was about to marry a young woman who was a positive influence on him. Although distressed by the revelation that Zachary was not his biological child, he was nonetheless staunchly adamant in his desire to continue loving and caring for the boy. He had strong family support in the form of his parentswho even Ms. Dupont admitted had been loving and concerned grandparents to her son. The presenceor absenceof such family support is a proper consideration in evaluating the best interest of the child.
Ms. Dupont, on the other hand, had little stability to offer the child. Her imprudent and ill-advised relationship with Mr. McGaha was only one of many factors which the trial court found to be indicative of her self-destructive behavior, poor judgment, and lack of responsibility. The testimony established that while the child was in Ms. Dupont's care, he was not well nourished or properly looked after and his health was compromised, due not to his mother's lack of means but to her lack of responsibility. Based on the record before us, we cannot say that the trial court was manifestly wrong in finding that an award of custody to Mr. Martin was in the child's best interest.

*580 CONCLUSION
The judgment of the trial court is affirmed. Costs are assessed against the appellant, Donna Dupont.
AFFIRMED.
NOTES
[1] Mr. Martin testified that this arrangement continued until he learned of Mr. McGaha's physical attack on the maternal grandmother, at which time he refused to return the child to Ms. Dupont and filed the instant suit. He stated that he had wanted to file suit earlier but Ms. Dupont had threatened to run off with the child if he sought a paternity test or specific custody rights.
[2] We note that the testimony of these witnesses was consistent with that of Mr. Martin's other witnesses, and that the testimony of all of Mr. Martin's witnesses was diametrically opposed to that of Ms. Dupont, the sole witness on her own behalf.
[3] The testimony indicates that Ms. Dupont had a sexual relationship with Mr. McGaha when she was a teenager. From this record, we glean that Mr. McGaha was incarcerated for several years, and Ms. Dupont resumed her relationship with him after his release.