833 So.2d 1224 (2002)
Scott LAMP, Plaintiff-Appellee
v.
Kimberly LAMP, Richard Lamp and Marion R. Pearson, Defendants-Appellants.
No. 36,919-CA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 2002.
*1225 Michael A. Duplantier, New Orleans, for Appellants, Richard and Marian Pearson.
Hamilton & Hamilton, by Orlando N. Hamilton, Jr., Oak Grove, for Appellee.
Before STEWART, GASKINS and PEATROSS, JJ.
GASKINS, J.
In this custody case involving an eight-year-old boy, the maternal grandparents, Richard and Marian Pearson, appeal from a trial court judgment awarding custody to the child's father, Scott Lamp. We affirm.

FACTS
Scott Lamp, age 17, and Kimberly Pearson, age 19, were married on July 31, 1993. The couple met in 1992 when Kim and her family moved to the Rogers/Bentonville *1226 area of Arkansas[1] and became members of the same church attended by Scott and his family.
At the time of the marriage, Scott was still a high school student. However, he obtained part-time employment which became full-time upon his graduation in May 1994. Kim was also employed. On November 27, 1994, Scott and Kim's son, Dakota Scott Lamp, was born.
The young couple's marriage was tumultuous. There was disharmony between their families; in particular, the Lamps were concerned about the age difference between the couple, Kim's influence over Scott, and Scott's youthful age. Kim accused Scott of abuse; she obtained several protective orders against him but always reconciled with him. Scott admitted slapping her on one occasion but denied all other accusations. Kim also obtained a restraining order against her in-laws at one point because she thought her father-in-law was plotting to "stir up" her marriage. Scott changed employment periodically, and they experienced financial difficulties.
Eventually, Kim took a job as an exotic dancer. While engaged in this employment, she met a man named Alan Bish. He is described in the trial record as "a con man [who] sold stolen stereos out of the back of a van." In January 1996, Kim ran off with Bish, leaving Scott, but taking Dakota, age 14 months, with her.
After leaving Arkansas with Bish, Kim periodically contacted her parents from various cities to ask for money. After receiving a call from a New Orleans motel in February 1996, the Pearsons drove there and persuaded Kim to allow them to take Dakota back with them. The baby was bruised and hungry. Upon their return to Arkansas with the baby, they did not contact Scott to inform him of his son's whereabouts. Thereafter, Kim called from Florida to tell them that Bish was in jail and she had no money. At her request, Mr. Pearson went to Florida and escorted his daughter back to Arkansas.
At some point after her return, Kim contacted Scott and allowed him to visit with Dakota at her parents' home when her parents were not there. In the summer of 1996, the Pearsons moved to Harahan, Louisiana, so that Mr. Pearson could begin the process of becoming a private investigator; Kim and Dakota went with them. Scott learned that his wife and son were gone when he went to the Pearson home and discovered one of the utilities being cut off. However, while Kim lived in Harahan with her parents, there was some telephone contact between her and Scott.
Bish came back into Kim's life. She and Dakota moved into an apartment with him. Her parents were unable to persuade her to allow Dakota to remain with them. However, due to Kim's excessive drinking and partying, the Pearsons frequently cared for Dakota on the weekends. In September 1996, Bish called the Pearsons to tell them that Kim was not breathing and was being taken to the hospital. Paramedics who responded to the call found her naked and handcuffed to the bed; she had inhaled VCR head cleaner, resulting in respiratory distress. Kim was in a coma and on a respirator for eight days. Scott was not informed of Kim's hospitalization.
While Kim was hospitalized, the Pearsons took care of Dakota. In late September 1996, they initiated custody proceedings against Kim in Jefferson Parish. They obtained first temporary custody and then in November 1997 permanent custody *1227 of Dakota.[2] However, Scott was not made a party to these proceeding in Jefferson Parish.
In July 1997, Scott filed a petition in Benton County, Arkansas, in which he requested a divorce from Kim and custody of Dakota. In January 1998, the divorce was granted. No determination of child custody was made in the final decree; however, the court specifically retained jurisdiction over the issue.
In March 1998, the Pearsons and Dakota moved to Lake Providence, Louisiana. Kim lived with them briefly, then moved to Oak Grove, Louisiana.
On November 24, 1999, the Pearsons filed a petition in East Carroll Parish to change Dakota's name from "Dakota Scott Lamp" to "Dakota Richard Pearson." In their petition, they asserted that Scott's whereabouts were unknown and failed to mention that Scott was not a party to their prior custody suit against Kim. The petition was apparently granted.
In January 2000, after finally locating Kim in Oak Grove, Scott filed a petition to reopen the Arkansas divorce proceedings to seek sole permanent custody of Dakota. The Arkansas court dismissed the petition without prejudice.
On May 30, 2000, Scott filed the instant petition for custody in West Carroll Parish, Louisiana.[3] In his petition, he sought sole custody of his son, citing Kim's deliberate actions in concealing the child from him. Kim was enjoined from removing the child from East and West Carroll Parishes.
Kim filed an exception of improper venue, claiming that she lived in East Carroll Parish. She also filed an exception of indispensable parties, seeking the addition of her parents to the action, asserting that they had been awarded custody of the child under a Jefferson Parish judgment in November 1997. The Pearsons filed an answer on October 19, 2000, and Scott subsequently amended his petition to include them as defendants.
On February 16, 2001, a preliminary default was entered against Kim. This judgment was confirmed on February 23, 2001; it awarded Scott full custody against any claim that might have been asserted by Kim. Scott's right to seek child support from Kim at a future time was recognized and maintained.
On February 20, 2001, the Pearsons filed a rule for child custody and child support against Scott. They sought sole custody or joint custody with themselves having primary custody.
Evidence was taken on February 20 and April 9, 2001, and February 25, 2002. At the conclusion of court on February 20, 2001, the trial judge ordered that Scott and his parents be granted visitation with Dakota at two-week intervals until the trial resumed in April. To make the visitations less traumatic for Dakota, the court directed that they be supervised by church friends of the Pearsons who were familiar to the boy.
*1228 The visitations were conducted on March 3, 17, and 31, 2001, from 10 a.m. to noon and 2 p.m. to 5 p.m. During the first visitation, Dakota interacted with the Lamps easily and comfortably. However, it became obvious to the psychologist observing the visit, Dr. Valerie Thigpen, that the boy did not understand who the Lamps were; he had to be told how he was related to them. The second visitation ended 90 minutes early because the person supervising the visitation, Mrs. Pearson's cousin, allowed the boy to call Mrs. Pearson and say he wanted to come home. On the third visitation, Dakota was openly hostile to the Lamps, especially Scott. Although the trial judge had given permission for the Lamps to take Dakota for an unsupervised lunch, the boy refused to go. (Prior to the visitation, Mrs. Pearson told Dakota if he didn't want to go lunch with the Lamps, he should tell them so.) After hearing testimony on April 9, 2001, about the child's behavior during the visitations, the trial court became concerned about the boy's mental health and ordered visitation suspended pending psychological evaluation of the child.
On April 30, 2001, the trial court ordered evaluations of the child, the maternal grandparents, the father and his parents by Dr. Susan Vigen. She interviewed Scott and the Pearsons in May 2001. Dr. Vigen advised the court that she did not evaluate adults but rendered a report giving her preliminary observations and recommendations in September 2001. Dr. Vigen described the Pearsons as having "a very intense relationship with Dakota in which contact with his natural parents is either excluded or minimized." She observed that the Pearsons blamed Scott for the choices Kim had made in her life. She also noted Dakota's overdependence on the Pearsons and concluded that it would likely continue without changes in his environment and possible counseling. Furthermore, she opined that the Pearsons' objection to Dr. Thigpen's presence during visitation indicated a desire to maintain control and eliminate observation of Dakota by a mental health professional. Dr. Vigen suggested that a court-appointed mental health expert be used to facilitate a "normalization" of Dakota's relationship with Scott and that visitation be structured and gradually increased.
On November 26, 2001, the court ordered evaluations by Dr. Angela Herzog, a clinical psychologist. These were conducted in December 2001. Dr. Herzog's report was submitted to the court in January 2002. She assessed the strengths and weaknesses of the various adults. While noting that Scott's great weakness was the lack of familiarity between him and Dakota, she opined that there was no basis to conclude that Scott's parental relationship should be terminated; to the contrary, it needed to be cultivated. As to the Pearsons' claims that Dakota had been traumatized, she stated that he should not be encouraged to be fearful with others but rather should be allowed to benefit from the love and affection of as many caring adults as possible, including Scott and his parents. Dr. Herzog found reason to believe that, instead, "the Pearsons have modeled avoidance and fearfulness with others, beyond what is rationally justified." In discussing Dakota's emotional ties to the Pearsons, Dr. Herzog noted that there were "factors which appear unhealthy, reflect maladjustment, and may thwart developmental growth toward autonomy." She also concluded that it did not appear probable that the Pearsons possessed the psychological traits necessary to facilitate Dakota's healthy relationships with the Lamps. According to Dr. Herzog's later testimony, the Pearsons, who she described as "rigid and compulsive," were close-minded to the possibility of Scott *1229 having a role in the child's life and they had not moved in the direction of helping Dakota assimilate his father into his life. She concluded her report by suggesting that professional intervention by a health care provider would be necessary if the court made any changes to the existing custody/visitation situation.
For the Christmas season, the trial court reinstated Scott's visitation with Dakota on the same schedule as before. On December 20, 2001, Scott filed a motion to hold Mrs. Pearson in contempt for allegedly interfering with his first visit with Dakota after the resumption of visitation on December 15, 2001.
On February 21, 2002, the Pearsons sought appointment of an independent counsel to represent the child under La. R.S. 9:345(A). Attached to this motion was a copy of Scott's petition to annul the judgment changing Dakota's name, alleging fraud and ill practices by the Pearsons. The Pearsons cited Scott's petition as evidence that the litigation pertaining to Dakota was likely to increase in intensity. The trial court denied the motion.
On June 25, 2002, the trial court issued written reasons for judgment. Finding that the Pearsons failed to prove that awarding Dakota to Scott would cause the child "substantial harm," the court awarded Scott custody of Dakota under a graduated transfer of custody. The court directed that the custody change would become effective January 1, 2003. The Pearsons were awarded visitation with the child one weekend per month, one week during spring break, one month during the summer, and holiday visitation from December 26 until 6 p.m. the night before school resumed.
The Pearsons appeal. They argue that the trial court erred in the following respects: (1) in not considering the Jefferson Parish custody judgment as a "considered decree"; (2) in requiring the Pearsons to bear the "substantial harm" burden of proof and in not applying the Bergeron rule to the father's petition for custody; and (3) in not properly applying the "best interest" rule of La. C.C. art. 131 as to the father's fitness and the impact of the judgment on the child.

LAW
The best interest of the child is the guiding principle in all child custody litigation. La. C.C. arts. 131, 134; Street v. May, 35,589 (La.App.2d Cir.12/5/01), 803 So.2d 312.
In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. Tennessee v. Campbell, 28,823 (La.App.2d Cir.10/30/96), 682 So.2d 1274; Myles v. Moore, 36,452 (La.App.2d Cir.8/30/02), 827 So.2d 516.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would result in substantial harm to the child, thus necessitating an award of custody to the nonparent. La. C.C. art. 133; Mills v. Wilkerson, 34,694 (La.App.2d Cir.3/26/01), 785 So.2d 69.
In an action to modify a previous nonconsidered decree between a parent and a nonparent, the nonparent must prove that awarding custody to the parent would result in substantial harm to the child. Myles v. Moore, supra.
However, after an initial considered decree, the parent's paramount right to custody must be weighed in conjunction with the principles expressed in Bergeron v. Bergeron, 492 So.2d 1193 (La.1986). Tennessee v. Campbell, supra. A considered *1230 decree is one in which evidence as to parental fitness to exercise custody is received by the court. Myles v. Moore, supra. A parent seeking custody of a child awarded to a nonparent by a previous considered decree bears the burden of proving that the continuation of present custody is so deleterious to the child as to justify a modification of the custody, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by the advantages a change affords the child. Myles v. Moore, supra; Tennessee v. Campbell, supra.
However, the Bergeron standards do not apply when a party to the current custody litigation was not a party to the original proceedings that produced the considered decree. Kroics v. Kroics, 1997-911 (La. App. 3d Cir.2/4/98), 705 So.2d 1302. See also In re Tutorship of M.A.H., 33,717 (La.App.2d Cir.8/23/00), 765 So.2d 1181; and Myles v. Moore, supra.
In a child custody case, the determination of the trial judge will not be disturbed absent a clear showing of abuse of discretion. Martin v. Dupont, 32,490 (La.App.2d Cir.12/8/99), 748 So.2d 574. The trial judge had the opportunity to see and hear the witnesses and to evaluate their sincerity and credibility. Martin v. Dupont, supra. An appellate court is required to extend great weight to the factual conclusions of trial courts which are based on reasonable evaluations of credibility and reasonable inferences of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989).

DISCUSSION

Burden of Proof
Scott was not a party to the Jefferson Parish custody litigation that produced the judgment granting custody of Dakota to the Pearsons. While the Jefferson Parish judgment may be a considered decree as to Kim, since her parental fitness was litigated, it is not a considered decree against Scott. Thus, the Bergeron rule does not apply to the instant proceedings. The present suit is an initial custody contest between a parent (Scott) and nonparents (the Pearsons) in which the nonparents bear the burden of proving that granting custody to the parent would result in substantial harm to the child. Like the trial court, we find that they have not carried their burden of proof.

Parental fitness
The Pearsons' attack on the trial court's award of custody to Scott is essentially two-pronged. They assail Scott's fitness as a parent and emphasize the effect of the custody transfer on Dakota. We first consider the evidence presented about Scott Lamp.
At the time of his marriage, Scott was a 17 year-old high school student. He turned 19 about two weeks before Dakota's birth. He was 20 when Kim left him and took Dakota. He is now 27 years old.
Although Scott changed jobs frequently in the past, he has now settled into a job he enjoys as a mechanic. Furthermore, he does not appear to have had any extensive periods of unemployment. He has changed jobs on occasion because he was headstrong and would not take orders. He currently lives with his parents in a pleasant three-bedroom house in a middle income neighborhood in Rogers, Arkansas. The local elementary school is located about two blocks from their home. Scott's father owns a successful computer software company. His mother has a part-time job as a church secretary which she is willing to quit in order to help care for Dakota. The entire Lamp family attends Bentonville Church of Christ. Scott's two older, married sisters also live *1231 in Bentonville with their families; in addition to Dakota, there are two other Lamp grandsons.
Scott has an affinity for automobiles and has participated in organized drag racing at the local drag strip. Not surprisingly, he also has had numerous traffic citations and he even lost his driver's license for a year due to his accumulation of points. In April 1996, he was charged with flight from an officer for trying to outrun a police officer who tried to stop him for a traffic violation. However, in February 2001, he testified that he had not had a moving violation in the previous 18 months.
Kim alleged that Scott was physically abusive to her. Scott admitted to one incident in which he slapped her and was arrested. Kim claimed that Scott tried to drown her on their honeymoon, made her trip over a vacuum cleaner while she was pregnant and pushed her over the back of a couch. Scott testified that he dunked her underwater in a swimming pool on their honeymoon and that she was not hurt. He described the couch incident as the result of horseplay, and he had no recollection of her falling over a vacuum cleaner.
The trial court apparently made a credibility determination in Scott's favor concerning these incidents. However, we note that there is nothing in the record suggesting that he mistreated Dakota while he had access to the child during the first 18 months of the child's life. The Pearsons characterize Scott as disinterested in his parental obligations, and they fault him for not conducting a more extensive search for his son. However, Scott testified that he hired investigators and searched for Kim and Dakota as his finances allowed over almost a four-year period. When he filed for divorce in Arkansas, he requested custody of his son. After he located Kim in Oak Grove, he again sought custody of the child, first in the Arkansas court and then in Louisiana.
Now at age 27, Scott is gainfully employed and has had time to mature since he and Kim separated. He and Dakota will live in a home where the child will have the opportunity to enjoy a close relationship with his paternal grandparents. There will be extended family members, including two younger first cousins, living nearby. All of the Lamps, including Scott, regularly attend church together.
The trial court, who had the superior opportunity to observe the witnesses and their demeanor, found nothing that mandated a finding of unfitness against Scott, who, as a parent, enjoys the paramount right of custody to his child over nonparents. On this record, we agree with that conclusion.

Substantial Harm
The Pearsons also allege that the trial court paid inadequate consideration to the potentially traumatic effect of the custody transfer upon Dakota.
Of particular note, the Pearsons argue that the trial court should have given greater credence to their expert, Janet Lushbaugh, who diagnosed Dakota as suffering from post-traumatic stress disorder and separation anxiety and opined that a change of custody would adversely affect the rest of his life. However, there are several factors concerning Ms. Lushbaugh's testimony which raises questions as to its validity. Ms. Lushbaugh relied exclusively upon information provided by the Pearsons, whereas the court-appointed experts, Dr. Vigen and Dr. Herzog, had the benefit of information from both sides of Dakota's family. Additionally, Ms. Lushbaugh initially testified that she had been treating Dakota for three years. On cross-examination, it was ascertained that *1232 she had seen the child on four occasions for a total of four hours. Yet the Pearsons represented to Dr. Herzog that Dakota had had no previous mental health treatment and that Ms. Lushbaugh felt he was well-adjusted. We note that Ms. Lushbaugh is only a licensed professional counselor; as such, she is not even allowed to administer certain psychological testing. When Dr. Herzog, a clinical psychologist, was asked by the trial court for her views on these diagnoses, she testified that she did not believe that she had sufficient clinical information to make such diagnoses. When pressed on the point by the Pearsons' counsel, she clarified that she had seen nothing to warrant those conclusions.
Lamentably, disruption of the everyday lives of young children and the resulting trauma are frequent and unavoidable consequences of child custody cases. In Tennessee v. Campbell, supra, this court found that absence of a strong relationship between father and son was not such "substantial harm" as to warrant denial of the father's petition to obtain custody of his son from the maternal grandmother. The same is equally true in the instant case. The potential trauma posed to Dakota here is rooted in his lack of a relationship with his father. The record shows that the Pearsons bear a significant amount of responsibility for this situation. They have gone to considerable lengths to eradicate all vestiges of Scott and his family from Dakota's life.[4] Consequently, some distress to the child is now inevitable as he is re-introduced to his paternal family.
The Pearsons unquestionably love Dakota and are well-intentioned. They feel rightly sothat they rescued him from Kim's depraved and dangerous lifestyle. However, in their overwhelming desire to protect him from what they perceive as harm, they have isolated the child to the point of making him dependent upon them to a unhealthy degree.
Dakota refers to his maternal grandparents as "Mom" and "Dad."[5] He is home schooled by Mrs. Pearson, a measure which appears to have restricted his ability to become independent and to mature. He also has a tremendous fear of strangers, especially men. When first enrolled in Sunday school, he was unable to remain in class by himself for a substantial period of time. His violin teacher described a similar inability to separate from the grandparents that was not age appropriate. Among other things, she recounted one episode when their absence from his presence for a few moments resulted in a screaming tantrum. In another instance, a male teacher entered the classroom where Dakota was taking lessons, prompting the boy to begin crying hysterically.
Dakota sleeps with his grandparents; he becomes upset if his grandmother gets out of bed before he wakes and demands to know why she left him. As previously noted, he has severe and extreme reactions to being separated from his grandparents, especially Mrs. Pearson. During trial, there was testimony that the visitations with the Lamps were difficult for the child *1233 because he was not accustomed to being dropped off and left anywhere by the Pearsons. Additionally, the Pearsons have felt a need to isolate Dakota from his paternal relatives, all of whom they apparently perceive as being bad.
We note that the Pearsons' compliance with the trial court's orders on Dakota's visitation with the Lamp family thus far has been, at best, begrudging. Even worse, Dakota's reactions to the visitations with the Lamps are strongly suggestive of outside forces. Dr. Herzog's analysis of the videotapes of the visits is instructive. The first two visits reveal no rejection of the Lamps; however, on the third one there was a blatant difference in Dakota's willingness to be around them. During the fourth visit, the child was unresponsive and extremely clingy to the visitation host and could not be favorably drawn to the Lamps. Dr. Herzog described his behavior as atypical for his age. In her opinion, the tapes showed a child being alienated from people from whom he was not previously alienated. Yet she could not discern any problematic conduct by the Lamps that would have caused the alienation. These incidents would appear to corroborate Dr. Herzog's conclusion that the Pearsons are unlikely to encourage a healthy relationship between Dakota and his father.
On the one hand, the Pearsons criticize their former son-in-law for not searching for his son more aggressively. On the other hand, they now vilify him because he actually succeeded in finally locating Dakota and filed the instant suit to obtain custody. The Pearsons refuse to fully acknowledge that their own daughter was responsible for exposing Dakota to the greatest trauma of his lifei.e., her relationship with Bish. Instead, they try to blame Scott for Kim's substance abuse and promiscuityeven though their own suit against Kim demonstrated that these problems already existed before she met Scott. They also conveniently ignore their own culpability in failing to contact Scott on numerous occasions when it would have been appropriate to inform him of important information concerning his son, i.e. Kim's hospitalization, their lawsuits to acquire custody of Dakota and change his name, and their move to Lake Providence.
Throughout the proceedings, the trial court exhibited great sensitivity toward Dakota's situation and attempted to minimize his trauma whenever possible. The court directed that the child's visitation with the Lamps be conducted in the presence of people with whom he was familiar and comfortable. These Saturday visitations were even split into morning and afternoon sessions. After learning of Dakota's extreme reactions to the visitations, the court suspended them pending psychological evaluation. After determining that an award of Dakota's custody to his father was appropriate, the court prudently ordered a graduated adjustment procedure, monitored by a mental health expert, to facilitate the custody transfer and to minimize trauma to the child to the extent possible. (Both Dr. Vigen and Dr. Herzog recommended professional intervention.) The actual transfer was even delayed until January 1, 2003, to allow a period of approximately six months for the child to become more familiar with his father. This action was in keeping with Dr. Herzog's suggestion; she said that she did not advocate an immediate change of custody. We find that these measures employed by the trial court were appropriate and, by now, they should have alleviated much of the potential harm to Dakota.
The trial court found that the Pearsons failed to carry their burden of proving that substantial harm to Dakota would result from awarding custody to his father. We *1234 find no manifest error in this conclusion. Furthermore, the record demonstrates that a graduated return to his father's custody is in the best interest of this child.

CONCLUSION
The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellants, Richard and Marian Pearson.
AFFIRMED.
NOTES
[1] Rogers and Bentonville are adjoining towns in northwest Arkansas.
[2] Following her near-fatal experience, Kim was involuntary committed under an emergency certificate. Upon her discharge from the hospital, she resumed her relationship with Bish. In August 1997, they were arrested for criminal damage to property for severely damaging a motel room and disturbing the peace.
[3] After she was served with process in the Arkansas suit, Kim left Oak Grove and moved to Lake Providence, where she was served with papers in Scott's Louisiana custody suit. She later moved to Monroe, where she was unemployed and living on public assistance in February 2001. She also had twin daughters and she was engaged to a man who was not the father of the twins.
[4] One noteworthy act to this end was their petition to change the child's name from Dakota Scott Lamp to Dakota Richard Pearson. In this petition, they alleged that Scott's whereabouts were unknowna particularly dubious assertion given Mr. Pearsons' occupation as a private investigator and the Lamps' continuing residence in the same area of Arkansas.
[5] In conjunction with this, we note with interest Mr. Pearson's explanation to Dakota of who would be at the visitations. He told the 6-year-old boy that he was going to meet his other grandparents and "there would be another person there by the name of Scott Lamp who's probably going to tell you that he is your daddy."