880 So.2d 988 (2004)
J.D. BLACKSHIRE, et al., Plaintiffs-Appellants
v.
Harvey WASHINGTON, Defendant-Appellee.
No. 39,028-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 2004.
*989 Kammer & Huckabay, by Pugh Huckabay, Shreveport, for Appellants.
Joel L. Pearce, Shreveport, for Appellee.
Before WILLIAMS, GASKINS and MOORE, JJ.
GASKINS, J.
The plaintiffs, J.D. Blackshire and Ellen Blackshire, appeal a trial court judgment granting sole custody of their minor granddaughters to the children's father, Harvey Washington. For the following reasons, we affirm the trial court judgment.

*990 FACTS
The minor girls in this matter are the children of the defendant, Harvey Washington, and the plaintiffs' daughter, Tracy Blackshire. H.M.W. was born January 24, 1994, and T.R.W. was born June 19, 1995. Mr. Washington and Tracy were not married, but he is listed as the father on the children's birth certificates. Tracy had an older son, C.T.B., born July 5, 1989, from another relationship. C.T.B. has always resided with the plaintiffs and his custody is not at issue in this matter.
Tracy was killed in an auto accident March 24, 2000. Before her death, the girls resided with their mother and father, but stayed with the Blackshires frequently. Mr. Washington and Tracy had a tumultuous relationship involving physical violence against each other. Police intervention was sometimes necessary. Mr. Washington and Tracy separated several weeks before Tracy was killed. At about the time of the separation, the girls began living with the Blackshires.
After Tracy's death, Mr. Washington began living with a woman named Nina. During the course of these proceedings, they married and had two daughters. On June 8, 2001, the Blackshires filed suit to obtain custody of H.M.W. and T.R.W. They claimed that Mr. Washington rarely visited the children and did not support them. The Blackshires also alleged that the Washingtons physically and verbally abused the girls and claimed that the children were afraid of their father.
On January 7, 2002, the Blackshires were granted provisional custody of the children. Mr. Washington filed a rule for contempt on March 13, 2002, alleging that he had been denied visitation. On March 15, 2002, the Blackshires filed a motion for a protective order alleging domestic abuse by Mr. Washington and Nina against the children.
The protracted hearing in this matter took place over approximately 21 months. The hearing began on April 4-5, 2002. The next day of trial was July 12, 2002. During the pendency of these proceedings, on January 23, 2003, an interim consent judgment was entered continuing provisional custody with the Blackshires and ordering Mr. Washington to pay $523 per month in child support. A visitation schedule was set up for Mr. Washington.
The next day of trial was October 10, 2003, and the final day of testimony was heard on January 16, 2004. The court took the matter under advisement and filed a judgment on February 18, 2004. Sole custody of the girls was awarded to Mr. Washington under a graduated transfer. Full custody of the children to Mr. Washington was to occur in July 2004. The court ordered that the Blackshires and the girls immediately begin family counseling to assist in the transfer, at Mr. Washington's expense. After the transfer, the Blackshires are to have visitation with the children according to a specified schedule.
The Blackshires appealed the trial court judgment, asserting several assignments of error. They argue that the trial court erred in failing to award custody of the children to them. They also contend that the trial court erred in not allowing the children to testify a second time in this protracted litigation; in not allowing the testimony of Robert Minnear, who had counseled the children; and in not allowing the introduction of the medical records of Dr. Carter Boyd, who treated T.R.W.

CUSTODY
The plaintiffs contend that the trial court erred in failing to award them custody of the girls, with reasonable visitation *991 to Mr. Washington. This argument is without merit.
The best interest of the child is the guiding principle in all child custody litigation. La. C.C. arts. 131, 134; Lamp v. Lamp, 36,919 (La.App.2d Cir.12/11/02), 833 So.2d 1224; Street v. May, 35,589 (La. App.2d Cir.12/5/01), 803 So.2d 312.
In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. Lamp v. Lamp, supra; Martin v. Dupont, 32,490 (La.App.2d Cir.12/8/99), 748 So.2d 574. La. C.C. art. 133 provides:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any other person able to provide an adequate and stable environment.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would result in substantial harm to the child, thus necessitating an award of custody to the nonparent. La. C.C. art. 133; Lamp v. Lamp, supra.
In a child custody case, the determination of the trial judge will not be disturbed absent a clear showing of abuse of discretion. Lamp v. Lamp, supra. An appellate court is required to extend great weight to the factual conclusions of trial courts which are based on reasonable evaluations of credibility and reasonable inferences of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trial judge has the opportunity to see and hear the witnesses and to evaluate their sincerity and credibility. The trial judge is in a better position to evaluate the credibility of witnesses and the weight of evidence than an appellate court, which does not hear or see the witnesses. For this reason, a reviewing court should adopt the trial court's findings as its own in the absence of clear error, even if other conclusions from the same evidence were equally reasonable. Martin v. Dupont, supra.
Mrs. Blackshire testified that she kept the girls frequently before Tracy's death. Since their mother's death, the girls have lived exclusively with the Blackshires. Mrs. Blackshire is retired and Mr. Blackshire works part time. He is partially paralyzed and cannot sit for long periods of time. Mr. Blackshire did not appear in these proceedings.
Mrs. Blackshire outlined the times that Mr. Washington exercised visitation with the children. Mrs. Blackshire denied doing anything to interfere with visitation.
Mrs. Blackshire admitted that the children's grades are poor, but asserted that H.M.W.'s grades worsened after she began visiting her father. Mrs. Blackshire claimed that she tried to get tutoring for H.M.W. from her school. The record shows that Mrs. Blackshire was extremely argumentative and uncooperative with school officials who offered help for H.M.W. The help offered was not to Mrs. Blackshire's liking and a verbal confrontation ensued. According to Mrs. Blackshire, Mr. Washington makes the girls do an excessive amount of school work and he ridicules and belittles T.R.W.
Mrs. Blackshire claimed that Nina threw T.R.W. against a sofa and injured her arm. T.R.W. told Mrs. Blackshire that Mr. Washington and Nina made her sit in front of a patio door during an electrical storm. Mrs. Blackshire also contended that Mr. *992 Washington jerked H.M.W. off a toilet in a store and spanked her. She further claimed that Mr. Washington tried to choke H.M.W. while combing her hair.
Mrs. Blackshire stated that on one occasion when she took the girls to meet Mr. Washington for visitation, T.R.W. resisted. She said that Mr. Washington pulled T.R.W. out of the car, injuring her arm. Mrs. Blackshire took the child to a doctor following the incident. Mrs. Blackshire testified that Nina tried to whip T.R.W. with a belt and that Mr. Washington threw T.R.W. on a bed and she bounced off, hitting a dresser. Mrs. Blackshire took the child to a doctor for treatment of back pain she claimed resulted from this incident. Mrs. Blackshire asserted that, during this incident, Mr. Washington prevented T.R.W. from calling 911. However, he later called the police. Mrs. Blackshire said that she did not take T.R.W. for her next scheduled visitation with Mr. Washington due to concerns for her safety.
Mrs. Blackshire acknowledged that the girls' half-brother, C.T.B., had discipline problems and had been accused of touching girls at school inappropriately. However, she explained that this was a problem with his entire sixth-grade class where the children have been "hugging, kissing, and pinching each other on the behind."
Eight-year-old H.M.W. testified that she likes her father and Nina, but wants to live with her grandparents. She said that her father and Nina do not treat T.R.W. well. H.M.W. testified that Nina threw T.R.W. on her arm against the sofa because T.R.W. was being bad. On further questioning, H.M.W. said that she did not think Nina was trying to hurt T.R.W.
H.M.W. stated that once, while at her father's house, she saw Mr. Washington watching a "nasty movie." H.M.W. said that she is afraid of her father and that he once choked her while combing her hair. However, she said that it was her grandmother that interpreted Mr. Washington's behavior as choking. H.M.W. admitted that she has not performed well in school.
Seven-year-old T.R.W. testified that she wants to live with her grandparents. She related that the girls sometimes sleep with their grandparents when visitors sleep in their bed. T.R.W. said that her grandmother has blocked Mr. Washington's calls when he was calling too much.
T.R.W. stated that she had seen pornographic movies at her father's house and that her father sometimes spanks the girls. According to T.R.W., Nina spanks her and once threw her into a sofa. T.R.W. said that she does not feel safe at her father's house and that he has told the girls that he will spank them when they go to live with him.
Caleetra Simmons, a friend of Tracy and Mr. Washington, testified that while the girls' mother was alive, Mr. Washington once hit Tracy, severely injuring her eye. Ms. Simmons said that about one year before Tracy died, she saw people buy marijuana at Mr. Washington's house, but she has never seen him use drugs or harm the children. Ms. Simmons related an incident in which transvestite friends of Mr. Washington attended a party at his house and engaged in oral sex with a cousin of Mr. Washington in the back yard while the children played in the front of the house.
The plaintiffs presented the testimony of several witnesses to establish that the girls stayed with them often. Delores Taylor related an incident in which Mr. Washington came to H.M.W.'s birthday party and made her leave early, upsetting the child.
Mickey Jones, a mental health counselor, testified on behalf of the plaintiffs. Ms. Jones stated that she had counseled Mrs. Blackshire and the girls. In June 2001, H.M.W. told Ms. Jones that she thought *993 her father was a drug dealer and described behavior indicative of a drug sale. H.M.W. also alluded to possible sexual abuse by her father while her mother was still alive. Ms. Jones stated that she did not think the child had been abused, noting that H.M.W. did not behave as a child that had been sexually molested, and thought the incident was more akin to giving a "wedgie."
Ms. Jones stated that H.M.W. had symptoms of anxiety including hair loss and nail biting. H.M.W. reported that her father spanked her for calling him by his first name. In January 2002, H.M.W. stated that she was upset over Mr. Washington making her leave her birthday party early. H.M.W. also said that her father told the girls that when he got custody, he was going to beat them. However, Ms. Jones stated that she did not think that Mr. Washington would actually beat the children.
In January 2002, Ms. Jones went to Mr. Washington's house while he had the girls. She observed that the house was appropriately clean. She also noted that Mr. Washington had a messy backyard with four large dogs. T.R.W. had a rash which might have been the result of an allergy to the dogs. Ms. Jones had a favorable impression of Nina, but thought it would be harmful to remove the girls from their grandmother suddenly.
Mr. Washington admitted having frequent physical altercations with the girls' mother, some of which were inflicted by Tracy. He acknowledged that he twice pled guilty to charges arising from those incidents. Following Tracy's death, he said he tried to see the girls frequently and often visited them at school. He claims that he exercised all the visitation that Mrs. Blackshire would allow him to.
Mr. Washington asserted that Mrs. Blackshire blocked his phone calls and thwarted his efforts to see his daughters. He produced five certified letters sent to Mrs. Blackshire seeking visitation with the girls and asking to have his calls unblocked. Mr. Washington claimed that he took sheriff's deputies with him to the Blackshires to see the girls. The children were instructed to leave the house by a back door. Mr. Washington claimed that on another occasion Mrs. Blackshire told the girls to hide in the house and not to answer the door when he came to the Blackshires' house.
Mr. Washington denied selling or using drugs and stated that he had undergone drug testing at work for the past two years with negative results. Although he admitted having pornographic movies on occasion, he claimed the children never saw them at his house. Mr. Washington denied spanking the children after being instructed by the court not to use corporal punishment. Mr. Washington denied choking H.M.W. He testified that he was merely trying to keep her head straight while he combed her hair. He also denied belittling T.R.W. He admitted being behind in his child support payments.
According to Mr. Washington, T.R.W. has a behavior problem. In January 2004, she was sent to her room and began kicking the door. The Washingtons checked on T.R.W. numerous times, but she refused to settle down. T.R.W. also threatened to tell the authorities if the Washingtons tried to physically discipline her. Later that night, after the passage of a significant period of time with no let up in T.R.W.'s bad behavior and with no effective way to discipline the child, Mr. Washington called the police to scare her. Ms. Blackshire stopped bringing the girls for visitation, claiming that he was mistreating T.R.W. He also acknowledged that child protection authorities were called, but stated that none of their investigations *994 supported the claims made against him.
Mr. Washington said that the children usually went for visitation more willingly if he picked them up from school rather than meeting Mrs. Blackshire for the exchange. He admitted taking T.R.W. back to Mrs. Blackshire early from Christmas visitation because the child wanted to go. He opined that T.R.W. wants to stay with her grandmother because of the lack of discipline in Mrs. Blackshire's home. Mr. Washington stated that Mrs. Blackshire is not fostering a good relationship between him and the girls.
Nina Washington testified that she gets along well with H.M.W., but has no relationship with T.R.W. According to Nina, Mrs. Blackshire told her that she shouldn't have anything to do with the girls. She also said that Mrs. Blackshire told the children that they did not have to listen to Nina. Nina stated that Mrs. Blackshire was not fostering a good relationship between Mr. Washington and the children.
Nina denied spanking the girls or throwing T.R.W. into a couch. She did order the child to sit on the couch and T.R.W. refused to obey. She also denied spanking her with a belt. Nina stated that she took a belt away from T.R.W. when the child was hitting the wall with the buckle. Nina acknowledged that they called the police regarding T.R.W.'s behavior. This seemed to be prompted by the lack of an effective method for controlling the child's behavior and the fear of allegations of mistreatment. The police discussed putting her in the youth shelter, but she was too young.
The plaintiffs assert that the trial court should have applied the reasoning of Mills v. Wilkerson, 34,694 (La.App.2d Cir.3/26/01), 785 So.2d 69, to this case. In Mills v. Wilkerson, supra, this court reversed a trial court judgment and awarded the custody of a child to the grandparents, rather than the father, following the death of the child's mother. In Mills, this court found that substantial harm would result to the child if custody was awarded to the father due to the father's alcoholism, unstable job and living arrangements, and limited time for the child.
Mr. Washington contends that the facts of the present case are analogous to Lamp v. Lamp, supra, in which this court ordered a gradual transfer of custody of a child to the father rather than awarding custody to the grandparents. We found that the father did not pose a substantial risk of harm to the child and that the grandparents thwarted any development of a relationship between the child and his father.
The trial court in this matter was presented with conflicting testimony regarding the care of H.M.W. and T.R.W. and was required to make credibility determinations. In its reasons for judgment, the trial court stated that it found Mr. Washington to be credible. The children were found not to be credible, were easily manipulated and were themselves manipulative. The court noted that the children were aware of the court-imposed ban on corporal punishment and flaunted that when visiting their father. The court stated that Mrs. Blackshire failed to produce the children for visitation on numerous occasions and their performance in school was "horrible" with H.M.W. failing all courses during the last reporting period.
The plaintiffs have failed to carry the burden of showing that substantial harm will result to the children if custody is placed with Mr. Washington. The record shows that Mr. Washington has steady employment, a stable relationship with his wife, and a deep concern for the welfare of H.M.W. and T.R.W. Any infrequency in his visitation with the children was caused by *995 Mrs. Blackshire in blocking his telephone calls and failing to deliver the children to the meeting place. Mrs. Blackshire also encouraged the children to disobey the Washingtons and exaggerated incidents to allege abuse.
In the present case, the allegations of abuse of the children by the father are troubling at first glance. However, we note that reasonable explanations were offered for those allegations. As to the incident in which Mr. Washington allegedly choked H.M.W. while combing her hair, he stated that he was merely trying to keep her head straight. H.M.W. testified that it was Mrs. Blackshire who interpreted the behavior as "choking."
After each incident in which Mrs. Washington perceived that Mr. Washington or Nina had physically abused the children, child protection authorities were contacted. The record shows that the complaints were investigated and found to be groundless.
The children's fear of their father seems to be instigated by Mrs. Blackshire. Although she complained that Mr. Washington's spanking was abusive, Mrs. Blackshire stated that she also had spanked the girls. The children claimed that they were called "ignorant" and "stupid" and made to work on homework for excessive hours. Although derogatory names are not healthy, the Washingtons are to be commended for trying to work with the girls when, under Mrs. Blackshire's tutelage, they are failing or close to failing.
The record shows that there are behavior problems with T.R.W., but it appears that she is encouraged by Mrs. Blackshire to disobey and to be disrespectful. Any attempts by the Washingtons to regulate her behavior are reported to the authorities as abuse. While the allegations of pornographic movies and drug sales in the Washington household are disturbing, it appears that these incidents occurred years ago, possibly while Tracy was still alive. We also observe that, while Tracy and Mr. Washington had a tumultuous relationship, many of their physical altercations were instigated by Tracy. For the past two years, Mr. Washington's drug screens at work indicate that he has not abused drugs. Nina also testified that there has been no physical abuse between them. Mr. Washington has had a past that is not stainless, but the evidence indicates that he has matured and is striving to be a good father and husband.
The record supports the finding that, even though Mrs. Blackshire obviously loves her granddaughters a great deal, she did not work to foster a good relationship between the girls and their father. Mrs. Blackshire has exacerbated and exaggerated conflicts to the point that the children fear their father. In fact, she encourages bad behavior and has been unable to make significant progress in the children's education. Based upon the record before us, we do not find that the trial court abused its discretion in placing the sole custody of the children with their father, Mr. Washington. The trial court correctly ordered the gradual transfer of sole custody of the children to their father, with visitation to the grandparents.

TESTIMONY OF THE CHILDREN
The plaintiffs argue that the trial court erred in refusing to allow the girls to testify a second time at trial. The plaintiffs wanted to put the girls on the stand to testify about conditions since their testimony 18 months earlier. According to the Blackshires, the trial court noted that it would be good to hear what the kids had to say, but then refused to allow them to testify.
A trial judge has great discretion in conducting a trial. The judge is required *996 to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. La. C.C.P. art. 1631; Palace Properties, L.L.C. v. Sizeler Hammond Square Limited Partnership, 2001-2812 (La.App. 1st Cir.12/30/02), 839 So.2d 82, writ denied, XXXX-XXXX (La.4/4/03), 840 So.2d 1219. The judge's discretion includes the admissibility of a witness's testimony. It is only upon a showing of a gross abuse of discretion that appellate courts have intervened. Palace Properties, L.L.C. v. Sizeler Hammond Square Limited Partnership, supra.
In the present case, the trial court heard the girls' testimony and was able to evaluate their credibility. The court heard the children's preference regarding where they wanted to live. The court was also made aware of the allegations of abuse that occurred after the children testified. There is no showing that the plaintiffs suffered prejudice due to the trial court's decision not to allow the girls to testify a second time. In making its ruling, the court was mindful that this litigation had been ongoing for a significant period of time. The court felt that allowing the children to testify once more would unduly delay the proceedings. Under the facts presented, we do not find that the trial court abused its discretion in refusing to allow this additional testimony.

EXPERT TESTIMONY AND MEDICAL EVIDENCE
The Blackshires argue that the trial court erred in refusing to allow the testimony of Robert Minnear, who counseled the children since the implementation of the new custody plan in January 2003. The grounds for the refusal included insufficient notice to the defense and the fact that this witness was not included on the witness list drawn up when the trial began almost two years earlier. The plaintiffs point out that this witness developed during the course of the proceedings and, although it might have prolonged the litigation to allow additional time for the defense to prepare for the witness, the importance of the custody of the children should have outweighed those concerns.
The Blackshires further assert that the trial court erred in refusing to allow the introduction into evidence of the medical records of Dr. Boyd regarding the treatment of T.R.W. for two injuries allegedly sustained while staying with Mr. Washington.
Counsel for the Blackshires argued that he found out about Mr. Minnear only a few days before that portion of the trial that was heard on January 16, 2004. Mr. Minnear had been counseling the children since December 2003, approximately one month. The Blackshires also sought to introduce the medical records of Dr. Boyd relating to treatment of T.R.W. The trial court rejected the suggestion that the proceedings be further delayed in order for Mr. Washington's counsel to prepare for the witness and this additional evidence.
The pretrial order controls the subsequent course of the action, though it can be modified at trial to prevent substantial injustice. The trier of fact is given broad discretion to determine whether to modify a pretrial order. This discretion is controlled by the principle that it must be exercised to prevent substantial injustice to the parties who have relied on the pretrial rulings or agreements and structured their preparation and presentation of their cases accordingly. Vernon v. Wade Correctional Institute, 26,053 (La.App.2d Cir.8/19/94), 642 So.2d 684; Southern Casing of Louisiana v. Houma Avionics, Inc., XXXX-XXXX, XXXX-XXXX (La.App. 1st Cir.9/28/01), 809 So.2d 1040.
*997 A trial judge has wide discretion in determining whether to allow a witness to testify as an expert, and his judgment will not be disturbed by an appellate court unless it is clearly erroneous. Hoerner v. ANCO Insulations, Inc., 2000-2333 (La. App. 4th Cir.1/23/02), 812 So.2d 45, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La.6/21/02), 819 So.2d 1023.
The trial court was faced with protracted litigation in this custody matter which included numerous delays. In order to move the proceedings to a conclusion, the court exercised its discretion in refusing to allow the witness to testify and in refusing to admit the medical records. The trial court was well aware of alleged problems occurring during the course of the proceedings that would have been the subject of this evidence. Under the circumstances present in this matter, we do not find that the trial court abused its discretion.

CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court granting sole custody of H.M.W. and T.R.W. to their father, Harvey Washington, with visitation to the grandparents, J.D. Blackshire and Ellen Blackshire, as set forth in the trial court judgment. Costs in this court are assessed to the plaintiffs.
AFFIRMED.