880 So.2d 157 (2004)
STATE of Louisiana, Appellee
v.
Steve TAUZIN, Appellant.
No. 38,436-KA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 2004.
Rehearing Denied September 16, 2004.
*158 Louisiana Appellate Project, by James E. Beal, Jonesboro, for Appellant.
Paul Joseph Carmouche, District Attorney, Mike Pitman, J. Thomas Butler, Assistant District Attorneys, for Appellee.
Before GASKINS, DREW and LOLLEY, JJ.
DREW, J.
Defendant, Steven Tauzin ("Tauzin"), was tried by jury and convicted as charged of second degree murder. He appeals his conviction. We affirm in all respects.

FACTS

Procedural History
On January 14, 2000, the badly beaten body of Gilbert W. Moore ("Moore"), a local coach, was discovered in his Shreveport home. Three months later, the defendant was indicted for first degree murder. Seven months after the capital indictment, the state filed an amended bill of information, reducing the charge to second degree murder. In due course, a jury found the defendant guilty as charged of second degree murder by a vote of eleven to one. A motion for new trial was filed by the defendant, but was orally withdrawn. The defendant was then sentenced to serve the statutory term of life imprisonment without benefit of probation, parole, or suspension of sentence. This timely appeal followed.

Trial Testimony of Misty Ellis
Misty Ellis ("Misty"), the main state witness, testified that:
 She knew the victim, Gilbert W. Moore, having lived with him "as friends" at his residence on East Stephenson Street in Shreveport for a while, until they had a falling-out in 1998, at which time she moved into her own apartment in Shreveport until about October of 1999.
 At that time, she moved into a residence located on Jean Lane in Bossier City with Tauzin and Noe Stephan ("Stephan").
 On the night of January 13, 2000, she was eating and drinking at a Bossier City sports bar, "The Locker Room," with Tauzin, Stephan, and two female neighbors, at which time she noticed Moore at the bar.
 Though she did not speak with Moore, she told Tauzin and Stephan that she used to live with the victim and that he still had some of her "stuff" at his home.
 They continued to eat and drink for a while and then left, at which time she, Tauzin, and Stephan went to a strip club called "The Centerfold" in Shreveport so Misty could check into getting her job back.
 The trio then went to another Shreveport club called "The Cabaret," where Misty unsuccessfully tried to contact a friend and recover some clothing.
 She came up with the idea for the three of them to break into the victim's home so she could get her remaining personal belongings, including clothing and the social security card *159 she needed so as to secure employment.
 At one time, she possessed keys to the victim's home, but she no longer had them on the night of January 13, 2000.
 Tauzin suggested that they get gloves from a hospital to prevent leaving any fingerprints, and this they did, stealing surgical gloves and a wheelchair from a Bossier City hospital.
 Next they went to their Jean Lane residence to change into dark clothing to reduce the chance of their being seen while breaking into the victim's home.
 At this time, Tauzin also armed himself with a crowbar.
 The three left their residence and drove past "The Locker Room" to make sure the victim was still there, which he was.
 Stephan drove them in his mother's car.
 Their plan was to quickly break into the victim's home, get Misty's belongings and leave.
 Upon arriving at the victim's home, the defendant was dropped off, with she and Stephan parking the car a block and a half away.
 She and Stephan walked to the victim's home, climbing his fence.
 Tauzin had previously climbed over the fence and had broken a window so as to enter the home.
 Tauzin let the others into the home through a side door, with none of them having authority to enter the premises.
 The three looked for Misty's belongings for a short time, at which point the victim arrived, agitated over the broken window.
 From a hiding place, Misty heard some arguing and then a "big thud," followed by gargling noises.
 She hid in the closet for about ten minutesnot knowing what was going on, and not wanting to be part of it.
 When things quieted down, she came out and saw the victim's body "face down" on the floor, with Tauzin standing a foot away from the victim, holding a hammer.
 Stephan was standing about two feet away from the victim, holding a flat pry bar (crowbar).
 Tauzin said that he "needed to take out some frustration."
 Tauzin wiped his forehead with paper towels and attempted to wipe off some footprints on the floor, later discarding the towels on the floor.
 Tauzin filled a syringe with cooking oil, pulled down the victim's pants and stuck the syringe in the victim's buttock.
 Tauzin looked through the victim's pockets for money, taking his keys.
 The three discussed setting the victim's home on fire.
 Finally, she insisted that they needed to leave, which they did, locking the victim's home, unlocking the gate, going through the gate, and re-locking the gate, at which point all three left in the car.
 She took off her gloves and put the keys inside them.
 Tauzin had stolen some of the victim's tools.
 On their way back to Bossier City, they stopped their car on the Shreveport-Barksdale Bridge, whereupon Tauzin exited the car, and then threw into the river his shirt, Stephan's shoes, all of their gloves, the victim's keys, and the crowbar.

*160  Back at their residence, the defendant told Misty and Stephan never to talk about what had happened.
 They went to sleep.
 Tauzin left town and went to Miami, Florida.
 Misty's mother told her that the police wanted to interview her.
 She went to the police station, where she denied any knowledge of the murder.
 She and Stephan went to Mexico, where they stayed for about a week, living on the beach.
 The two of them sent word to the defendant to meet them in Mexico, which he did, the three staying together in Mexico for about a week, before they returned to the Shreveport-Bossier area to get some money and the defendant's truck.
 The trio then returned to Mexico and got an apartment in Nuevo Laredo.
 Tauzin returned to the Shreveport-Bossier area, with she and Stephan following about a week later, at which time she was apprehended on an outstanding bench warrant for using fake identification at a Bossier Parish casino in 1997.

Other Testimony
Custus Rainey, the owner of "The Locker Room," testified at trial that:
 On the night of January 13, 2000, the defendant, Misty, Stephan, and two female neighbors came into his bar to eat and drink.
 Misty's testimony regarding what transpired at the bar was essentially correct, including the fact that defendant paid for the group's meals and drinks with a check and that they left the bar at about 10:00 or 11:00 p.m.
 The victim was also in the bar that night.
 He did not recall seeing anyone from the defendant's group speak to the victim.
 The victim was a regular customer and long-time friend of Rainey.
 The victim stayed at the bar until after the 2:00 a.m. closing time and helped to clean up, leaving about 2:30 or 3:00 a.m.
John Gresham, a friend of the victim, testified that on the morning of January 14, 2000, he became concerned when the victim failed to answer his doorbell. He climbed the wrought iron fence, approached the home, and saw the victim's body through a window. He climbed back over the fence and went to a neighbor's house to call 911. Then Gresham returned to the victim's home and forced the front door open with his shoulder in an attempt to render aid to the victim. Gresham saw the victim, apparently dead, with a head wound, lying in a big pool of blood. He touched nothing and went back outside to wait for help.
When police officers, detectives, and crime scene investigators arrived on the scene, they found the victim lying face down in a pool of blood on the kitchen floor, a hammer on the floor nearby, and blood spatters on the walls and ceiling. The victim's pants were pulled halfway down, exposing a syringe stuck in his right buttock. A plastic bottle of cooking oil and a roll of paper towels were located on a table to the right of the victim. There were two crumpled-up bundles of paper towels near the victim. One bundle, which was located near the victim's left foot, contained a couple of drops of blood. The other bundle was located near the right side of the victim's torso. A portion of that bundle was partially soaked in blood. The victim's home and truck both appeared *161 to have been ransacked. There were tools and other items piled up in the front room of the home.
Police testified that the scene was processed for evidence, and photographed. Later in the investigation, pursuant to the execution of a search warrant, various firearms were found in a bag located in a closet in the victim's home. These items included a Colt AR-15, a 9-millimeter Interdynamic, a .45-caliber Ingram, a silencer, gun parts, and ammunition.
The autopsy performed on the victim revealed that death was caused by multiple blunt force injuries received as a result of a beating with one or more heavy, blunt objects. There was evidence on the victim's head of between twelve and eighteen separate blows that crushed the skull. Between four and six of these blows could have been lethal had they been inflicted separately. The characteristics of the majority of the head wounds were consistent with the claw hammer found at the scene. The rest of the victim's body contained evidence of approximately six blows, including injuries to the lower back and the forearms. The nature of these injuries indicated that they had been inflicted by a long, slender object of about one-half inch in diameter, a description more consistent with a crowbar than a hammer.
Forensic DNA analysis was later performed on the paper towels recovered from the crime scene and compared to a reference sample taken from the defendant. Two stains on a paper towel were attributable to the defendant. It was calculated that the likelihood that the DNA came from a Caucasian other than the defendant was one in 82.5 trillion. On the same paper towel were two other stains, presumptive for blood, which were attributed to the victim. DNA reference samples taken from Misty and Stephan excluded them as donors regarding this same paper towel. A blood spatter expert opined that the blood stains contained on one of the paper towels were consistent with use of the paper towel to wipe blood from a nonporous surface, such as skin.
Melissa Quick verified that the defendant (her former fiancé) showed up at her Miami, Florida, residence in January 2000. The defendant explained that he had to "get away" from Shreveport because he was a suspect in a murder. Quick's current fiancé told the defendant that he had to leave, which he did.
Robert Catts testified that the defendant, Misty, and Stephan stayed at his residence for about two weeks in February 2000. He explained that the defendant telephoned him from a bus station early one morning and told him that he needed a place to stay because he and his wife had split up. Catts related that he found it strange that the defendant was at the bus station because he knew that the defendant owned a truck. Later that morning, the defendant arrived at Catts's residence, accompanied by Misty and Stephan. The defendant explained to Catts that the police were trying to "pin" the murder of the tennis coach on them and they needed to get away to get their alibis together. Catts suspected that the trio were involved in the murder and feared for his own safety. He related the details of how he contacted the authorities and cooperated with the police so that they could be apprehended.

Defendant's Trial Testimony
Tauzin's testimony regarding the events leading up to the break-in basically corroborated that of Misty and the bar owner. The defendant swore that:
 He drank four or five "kamikazes" at "The Locker Room" and was "kinda drunk" on the night of the killing.

*162  He was against breaking into the victim's home, but after Misty explained that she needed her clothes and social security card, and that she had keys, he went along with the plan.
 It was Stephan's idea to steal gloves so they would not leave any fingerprints.
 After they broke into the victim's home, he was drunk and mostly sat on the couch without wandering around much.
 Misty and Stephan searched the victim's home.
 Misty found a card to the victim from her sister, and became angry.
 When they heard the victim return home, Stephan ran into the kitchen and hid behind the door with the crowbar that Stephan brought with them.
 He (Tauzin) ducked into a closet.
 Stephan began beating the victim.
 When he (Tauzin) came back into the kitchen, he saw Stephan still beating the victim, so he walked back out.
 When he returned to the kitchen, Misty had the crowbar and was beating the victim as she screamed at him.
 Blood spattered onto his face, so he wiped his head with a paper towel.
 Stephan took the crowbar back from Misty and told him to hit the victim, because they were "all in this together."
 He complied, hitting the victim once with the hammer, then dropping it.
 He never hit the victim in the head with the hammer, his only blow being to the body or arm.
 He told Misty and Stephan that he was leaving, and they followed him out of the victim's home.
 Misty locked the door and gate behind them (with keys she must have had all along) and threw the keys into the woods across from the victim's home.
 Stephan stopped the car at the top of the bridge, told everyone to take off their clothes, and then threw the clothes and crowbar into the river.
 After the crime, he tried to get away from Misty and Stephan by going to stay with a friend, though he was later convinced to join Stephan and Misty in Mexico.
 He was mentally drained from these events, and from his child custody battle with his ex-wife, so a beach vacation sounded like a good idea.
 He ran after the murder because he was scared.

DISCUSSION

Motion in Limine
On February 28, 2003, the state filed a motion in limine seeking to prohibit the defense from cross-examining state witness Misty Ellis regarding her prior work as a "stripper" and about her prior drug use. A week later, the state filed an amended motion in limine seeking to prohibit the defense from questioning Misty at trial regarding the following areas:
 Use of controlled substances;
 Employment as a "stripper" or an "exotic dancer";
 Clothing worn by Misty while dancing;
 Sexual past, including names and number of sexual partners;
 Previous psychiatric or psychological care;
 Financial situation, including tax returns filed or not filed; and
 Her ability to drive a vehicle and/or possession of a driver's license.
At the hearing relative to these motions in limine, the state cited La. C.E. art. 608 for the proposition that a witness's general reputation may be attacked, but *163 admission of evidence of specific particular acts is impermissible. The state pointed to a litany of questions of Misty by the defense at the preliminary examination as questions that are impermissible. The court discussed the motion in limine regarding particular acts, and it was clarified that prior inconsistent statements made under oath would be permissible. At the conclusion, the trial court granted the state's amended motion in limine with respect to all of the areas listed, with the exception of the area regarding Misty's ability to drive a vehicle and/or possession of a driver's license (which the defense argued showed her reputation for untruthfulness).
During the defense's cross-examination of Misty at trial, the state made several objections. Outside the presence of the jury, the court went over these objections and took arguments for the record. Particularly, the trial court sustained the state's objection to questions by defense counsel regarding Misty's tattoos, past drug use, sexual activity, and lying. In reviewing the rulings and taking arguments, the trial court noted that these areas of questioning were included in the state's pre-trial motions in limine, which had been granted.
On appeal, defendant summarizes testimony given by Misty at the preliminary examination on cross-examination. The defendant lists Misty's various admissions of using drugs and dancing nude and topless for money. He also asserts that Misty admitted lying on several occasions and in several different situations. Misty's problems with her mother concerning lying and her filing and/or failure to file tax returns are also set forth. The defendant concludes that he was forced to testify to rebut Misty's devastating testimony, which further demolished his case. The defendant asserts that had he been allowed to adequately cross-examine Misty at trial, it would not have been necessary for him to take the witness stand, and the eleven to one jury verdict might have been different. He alleges that his rights under the Sixth Amendment of the United States Constitution and Louisiana Constitution article I, § 16, were violated, and his conviction should be vacated and reversed.
The Sixth Amendment of the United States Constitution and article I, § 16, of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, writs denied, 99-3477 (La.6/30/00), 765 So.2d 1062, and 00-0150 (La.6/30/00), 765 So.2d 1066.
Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. State v. Hillard, 398 So.2d 1057 (La.1981). The scope and extent of cross-examination is within the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion. State v. Garrison, 400 So.2d 874 (La.1981); State v. Hotoph, supra.
An accused also has a constitutional right to present a defense. Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Hotoph, supra.
La. C.E. art. 608, regarding attacking or supporting credibility by character evidence, provides in pertinent part:
A. Reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the *164 form of general reputation only, but subject to these limitations:
(1) The evidence may refer only to character for truthfulness or untruthfulness.
(2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
(3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.
Although La. C.E. art. 607(C) permits a party to attack the credibility of a witness by examining him concerning any matter having a reasonable tendency to disprove the truthfulness of his testimony, this grant is necessarily subject to the relevancy balance of La. C.E. art. 403 and to the limitation set forth in La. C.E. art. 608(B), generally precluding inquiry into particular acts, vices or courses of conduct to attack character for truthfulness. State v. Meshell, 567 So.2d 1181 (La.App. 3d Cir.1990), writ denied, 572 So.2d 87 (La.1991).
The state correctly points out that this was also the rule of law prior to the enactment of the Louisiana Code of Evidence, which was based upon then-existing La. R.S. 15:491. See State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, Burrell v. Louisiana, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
In Hotoph, supra, the defense counsel attempted to question the victim/witness about whether she had ever boasted in general about her ability to lie. The trial court limited cross examination in this area to questions relating to lying about the accusations in the case. Hotoph argued that the trial court erred by limiting the questioning in this manner. Citing La. C.E. art. 608(B), the appellate court noted that Hotoph wished to inquire specifically into a particular course of conduct of the victim, specifically, that she boasted about lying. Because Hotoph's intention was to ask about specific acts of the victim, the appellate court concluded that the trial court was correct in not allowing Hotoph to ask the question, citing State v. Ellis, 94-599 (La.App. 5th Cir.5/30/95), 657 So.2d 341, writs denied, 95-2095 (La.12/8/95), 664 So.2d 421, and 95-1639 (La.1/5/96), 666 So.2d 300.
Relevancy and admissibility calls are properly within the discretion of the trial judge, whose determinations in these areas should not be overturned absent a clear abuse of discretion. See State v. Mosby, 595 So.2d 1135 (La.1992).
The record reveals that the trial court did not abuse its discretion by granting the state's pre-trial motions in limine, and in sustaining the state's objections during trial, regarding the admissibility of evidence of the witness's prior drug use, past sexual activity, and "habitual lying." See State v. Mosby, supra, and State v. Hotoph, supra. These rulings correctly applied La. C.E. art. 608, allowing evidence of the witness's general reputation with regard to truthfulness or untruthfulness, but prohibiting inquiry into particular acts, vices, or courses of conduct, other than criminal convictions. See La. C.E. art. 608(A)(1) and (B). The evidence the defense sought to present to the jury was clearly nothing more than "particular acts, *165 vices or courses of conduct" calculated to "taint" the witness's testimony. As the state correctly notes, the defense still managed to present much of this subject matter to the jury, despite the trial court's pre-trial ruling to the contrary. The jury was unconvinced that her testimony should be discredited. Defendant has failed to support his arguments that the defendant's right to cross-examination was violated. We affirm the conviction.

Sentence
Defendant does not complain of his sentence. We agree, noting nothing in this record that could lead a reviewing court to consider amending the mandatory life sentence for this despicable and senseless offense. Accordingly, we affirm Tauzin's life sentence. He earned all of it.

DECREE
The defendant's conviction and sentence are AFFIRMED.
APPLICATION FOR REHEARING
Before STEWART, GASKINS, PEATROSS, DREW and LOLLEY, JJ.
Rehearing denied.