903 So.2d 590 (2005)
Anne Marie Cole CAIN, Plaintiff-Appellee,
v.
Kevin John CAIN, Defendant-Appellant.
No. 39,903-CA.
Court of Appeal of Louisiana, Second Circuit.
May 11, 2005.
*591 Charles H. Kammer, III, Shreveport, for Appellant.
Kevin John Cain, pro se.
Gary A. Bowers, for Appellee.
Before GASKINS, CARAWAY and MOORE, JJ.
MOORE, J.
Kevin Cain appeals a judgment awarding sole custody of his two sons, Adam and Jacob, to their mother, Anne-Marie Cole, subject to limited visitation. Appearing pro se, Kevin chiefly contests the report and testimony of a court-appointed mental health panel which found he suffered from severe mental illness and recommended limited, supervised visitation until he completed evaluation and therapy with a mental health provider. For the reasons expressed, we affirm.

Factual Background
Kevin and Anne-Marie were married in December 1986. Adam was born in February 1991, Jacob in March 1994.
In March 1995, Kevin was voluntarily admitted to Charter Forest, a mental health facility, for erratic conduct, major depression and suicidal thoughts. After three days, Kevin tried to discharge himself from Charter Forest; Dr. Lee Stevens and Dr. Kevin Brown issued certificates to have him involuntarily confined because he was suicidal and gravely disabled. Dr. Stevens diagnosed a bipolar condition and personality disorders; according to Charter Forest's records, Kevin told Dr. Thomas Staats that he had been "self-medicating himself for stress with marijuana," and he admitted to Dr. Stevens that he had been using Mini Thins, marijuana and crystal methamphetamine. In late March, Kevin was discharged; Dr. Stevens "deferred" making a discharge diagnosis, but prescribed an anti-depressant and recommended further medical treatment.
Roughly two months after he left Charter Forest, Kevin joined the U.S. Army, spending most of the next four years out of state.
Anne-Marie filed a petition for divorce in September 1996. The judgment of divorce awarded joint custody and designated Anne-Marie the domiciliary parent, but did not enter a plan of implementation; at the time, Kevin was still out of state in the service. He testified, however, that he phoned the boys every night during this period. He was honorably discharged in October 1999, returned to Louisiana and moved in with his mother in western Caddo Parish.
*592 According to Anne-Marie, on his return Kevin "demanded" to have the boys every weekend, harassing her and the boys with phone calls, uninvited personal visits to her house in Broadmoor, shouting, cursing, and making death threats. She testified that Kevin's conduct turned suddenly worse after she remarried in October 2002. On January 7, 2003, she filed a rule to implement a plan of joint custody and for injunctive relief. She alleged that his "escalating pattern of abusive behavior" was a change of circumstances. She described seven incidents between June and November 2002. On one occasion, he told her she would be "dead before the day was over" because she took one of the boys directly to ball practice instead of to Kevin's house first. On another, he returned the boys from visitation 2½ hours early, only to find Anne-Marie not yet home; later, he came back, pounded on her back door, cursed and threatened her in front of one of the boys; rang her doorbell repeatedly until she threatened to call the police; parked nearby to observe her actions; and barraged her with phone calls.
At a hearing on the rule, Kevin's counsel requested mental health evaluations under La. R.S. 9:331. The district court entered a judgment and interim order on February 19, 2003. The judge appointed a psychologist, Dr. Susan Vigen, to evaluate the children, and a psychiatrist, Dr. Richard Williams, to evaluate Kevin and Anne-Marie; issued a TRO enjoining both parties from harassing or threatening one another; and granted Kevin visitation from Friday night to Sunday afternoon two out of every three weekends, pending the mental health evaluation. Kevin testified that the interim scheme worked smoothly, except that Anne-Marie resented getting less weekend time than he did; Anne-Marie, however, related an unchanged pattern of friction and harassment.
In June 2003, the mental health panel (joined by another psychologist, Dr. Mark Vigen) filed its report, a very negative assessment of Kevin. The panel strongly criticized him for failing to disclose his prior CDS use and psychiatric treatment; Dr. Williams was especially concerned that Kevin suppressed these facts when he enlisted in the Army. The report labeled him "rigid, defensive, and deceptive"; diagnosed an untreated bipolar disorder and narcissistic and paranoid personality disorder; predicted that without medication, he would have "severe difficulties in communication" with Anne-Marie; and found "it is not safe for him to have unsupervised visitation with the children." The panel recommended one day of visitation every other weekend "in a supervised setting" and that Kevin should obtain psychiatric treatment with quarterly reports to the panel.
On July 25, 2003, Anne-Marie filed the instant motion to amend her petition, seeking sole custody and restricting Kevin to the supervised visitation set forth in the mental health panel's report. After a hearing, the district court issued an amended interim order dated August 29, adopting the panel's recommendations.
The parties admit that from the date of the amended order until trial in September 2004, Kevin never once exercised supervised visitation, instead seeing the boys for roughly one hour each week by attending their Sunday church service at Broadmoor Presbyterian. Kevin testified that he discussed the matter with the boys, and they did not want to visit within sight and sound of a supervisor. However, during in camera examination by the court, one of the boys testified that his dad disliked supervised visitation and told them so.
Also after the amended order, Kevin returned to Dr. Stevens's office for the first time in eight years. Kevin testified *593 that his Charter Forest records from March 1995 were "erroneous" in that he had never told anyone he was using CDS or contemplating suicide. Dr. Stevens related that Kevin appeared without an appointment and wanted him to delete portions of the Charter Forest record, or else he would file ethical complaints with various medical agencies. Dr. Stevens refused to alter the records. Kevin lodged complaints against him with six agencies; all were dismissed.[1]
In September 2003, Kevin contacted Dr. Gerald Baker, a clinical psychologist. Dr. Baker administered an MMPI; test results indicated no psychopathology or anything to say he is unsuitable for parenting. He noted, however, that Kevin "places himself in an overly positive light by minimizing faults and denying psychological problems." He admitted, however, that Kevin never showed him Anne-Marie's petition or her allegations of death threats and harassment, never disclosed the fact that he had threatened Dr. Stevens, and denied ever using CDS. Dr. Baker also testified it was unusual for a parent to forgo all visitation just because it was supervised.
In late October 2003, Kevin hired a forensic psychiatrist, Dr. Alberto Goldwaser of Paramus, New Jersey. He performed a "psychiatric-legal examination," finding no mental disorder that poses any risk to Kevin's children. He disagreed with the Charter Forest assessment on grounds that bipolar condition cannot "clear up" without medical attention; he felt the reason for Kevin's 1995 confinement was "substance-induced mood disorder," as Kevin admitted the occasional use of methamphetamine to aid his breathing. Because there were no "significant problems during the 3½ years of uninterrupted and unsupervised time-sharing," he felt this validated Kevin's parental fitness. He admitted, however, that Kevin did not disclose Anne-Marie's allegations of threats and harassment; that he had threatened Dr. Stevens; or even the contents of Kevin's deposition.

Trial Testimony
The matter was tried over four days in September 2004. Anne-Marie elaborated on the incidents described in her rule; while he had visitation two of every three weekends, Kevin would never adjust it to accommodate her schedule, but he took great liberty in returning the boys early or late without advance notice. Virtually every custody exchange provoked Kevin into a rage, with loud profanities and death threats; she estimated he threatened her 25-50 times. Anne-Marie's father, Jeff Cole, corroborated several incidents, as when Kevin tailgated them home after a Dixie League baseball game in Monroe, blocked her egress after they left the boys for visitation, and cursed and profaned her on many occasions. Dr. Williams, who headed the mental health panel, testified that Kevin was a danger to his children because of his chronic dishonesty; "his only regard is what he thinks is right." Dr. Williams recommended Dr. Patrick Sewell to evaluate Kevin, prescribe any necessary medication, and make quarterly reports to the court. The boys testified in camera, out of the presence of the parties or their attorneys, that their dad had never hurt or neglected them, but he had a bad temper, hollered and cursed at their *594 mom, and was seldom willing to do what they wanted on visitation. They especially disliked when Kevin made them sit in the house and read medical textbooks.
Kevin testified that visitation under the previous plans had worked smoothly. He denied Anne-Marie's claim that he threatened to kill her at least 25 times; he discounted her other allegations, such as the tailgating incident, as grossly exaggerated. He maintained that he checked into Charter Forest only because Anne-Marie and her domineering father had pressured him; he told the doctors about his CDS use and suicidal thoughts only because it was "what they wanted to hear," although in point of fact he never did drugs or contemplated suicide. He testified that he hired Dr. Goldwaser, and visited Dr. Stevens's office in 2003, only to clear up "errors" in his Charter Forest record. He offered Dr. Goldwaser's and Dr. Baker's depositions into evidence. He also called his mother and two family friends to testify they had never seen Kevin act inappropriately with his sons.

Action of the District Court
The district court rendered oral reasons, finding that both parents loved their children but the complete breakdown of communication between the parties made joint custody impossible. The court found the boys were scared of their father and did not want visitation every weekend. It further noted that while Anne-Marie had remarried and "gone on with her life," Kevin did not have an "open door relationship" with the boys. The court awarded sole custody to Anne-Marie, with Kevin to exercise unsupervised visitation from 10 am to 6 pm every other Saturday, pending further orders of the court. The court also ordered Kevin to make an appointment with Dr. Sewell, and submit to any testing or treatment he might offer. Finally, the judgment gave detailed instructions regarding the exchange of custody on visitation days, the exchange of information between the parties, and other matters not specifically challenged on appeal.
Kevin has appealed, urging by pro se brief eight assignments of error, which we have grouped according to subject matter.

Award of Sole Custody
By three assignments of error, Kevin contests the award of sole custody to Anne-Marie. By his first assignment, he contends that Anne-Marie failed to prove a change of circumstances materially affecting the children's welfare since the original decree, and that the proposed modification is in their best interest. Matherne v. Matherne, 562 So.2d 937 (La. App. 5 Cir.1990).[2] He contends that she offered no proof of her allegations of harassment or that Kevin was unfit or a harm to the children, and thus failed to meet her burden. By his fifth assignment, he argues the trial court erred in failing to consider Anne-Marie's moral character insofar as it affects the children's welfare. Specifically, he contends that in a request for admissions, she denied ever smoking marijuana, but his own "discovery witness list provided two witnesses who could testify to the fact that she consumed illegal drugs during pregnancy with both children." By his eighth assignment, he urges the court failed to consider the "evidence as a whole" in determining the best interest of the children. In support, he cites the factors for determining a child's best interest, La. C.C. art. 134; he quotes passages from the mental health panel's report, and from Dr. Goldwaser's deposition, which would support seven of the 12 factors. He also refers to a report by Dr. *595 Anita Kablinger, a psychiatrist at LSU Health Sciences Center.
In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La. C.C. art. 131; AEB v. JBE, 99-2668 (La.11/30/99), 752 So.2d 756. The court shall consider all relevant factors in determining the best interest of the child. La. C.C. art. 134.[3] The factors are provided as a guide to the court; the relative weight assigned to each is within the court's discretion. Flanagan v. Flanagan, 36,852 (La.App. 2 Cir. 3/5/03), 839 So.2d 1070. If custody in one parent is shown by clear and convincing evidence to serve the best interest of the child, the court shall award custody to that parent. La. C.C. art. 132; Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731.
When the original decree is a stipulated judgment, the party seeking to modify a custody plan must prove that there has been a change in circumstances materially affecting the welfare of the child since the original decree and that the proposed modification is in the best interest of the child. Evans v. Lungrin, supra; Flanagan v. Flanagan, supra. The determination of the trial court in custody matters is entitled to great weight; this discretion will not be disturbed on review in the absence of a clear showing of abuse. AEB v. JBE, supra; Bergeron v. Bergeron, 492 So.2d 1193 (La.1986); Blackshire v. Washington, 39,028 (La.App. 2 Cir. 8/18/04), 880 So.2d 988. The trial court's great discretion is premised on its superior position to see and hear the witnesses and evaluate their sincerity and credibility. For this reason, the appellate court adopts the lower court's findings as its own in the absence of clear error, even if other conclusions from the same testimony might seem equally reasonable. Blackshire v. Washington, supra.
There is no merit to Kevin's contention that Anne-Marie "offered no proof of her allegations of harassment by the Father or that the Father was unfit or a harm to the children." Anne-Marie graphically described a pattern of harassment and threats; her father and the children corroborated much of her testimony, which this court has already outlined and will not belabor. The mental health panel found bipolar disorder and other serious problems; Drs. Williams and Vigen also testified, and were uncommonly frank in depicting the risk of extended or unsupervised *596 visitation. Against this evidence, the district court considered Kevin's testimony, selected passages of the panel's report (taken in isolation, these presented a less critical view of Kevin), and the reports of Drs. Baker and Goldwaser. On this wide divergence of evidence, we cannot say the district court abused its great discretion. Blackshire v. Washington, supra.
There is also no basis to reconsider or revisit the best interest factors of La. C.C. art. 134. The district court plainly acknowledged both parties' love, affection and capacity to provide for the children. While there was testimony that both Anne-Marie and Kevin may have smoked marijuana together early in their marriage, no one established that she did so after early 1995. The mental health panel's conclusions, together with the history of friction in the exchange of custody, weigh heavily in favor of the district court's judgment. We perceive no abuse of discretion. Flanagan v. Flanagan, supra.
The record evidence, taken as a whole, supports the district court's finding of a change in circumstances since the 1996 consent judgment of joint custody and that awarding sole custody to Anne-Marie is in the children's best interest. These assignments of error lack merit.

Expert Testimony
By three assignments of error, Kevin urges that the district court should have assigned more weight to his experts, Drs. Goldwaser and Baker, and less to the court-appointed mental health panel. By his second assignment, he contends the district court "unjustifiably disregarded the facts and evidence presented by medical experts that validly substantiated" his own fitness as a parent. By his seventh assignment, he urges the court erred in not considering his claim that the 1995 Charter Forest admission was invalid and incorrect, given the evidence of Dr. Stevens's "character as a witness and competence as an M.D." By his sixth assignment, he argues the court erred in considering the Charter Forest record as evidence that he is unfit, while otherwise limiting the trial events that occurred after 1997. He contends that the Charter Forest record was simply irrelevant. In support he cites La. C.E. arts. 401, 403.
Anne-Marie responds that Kevin withheld critical information from Drs. Goldwaser and Baker, casting doubt on their opinions and warranting the court's refusal to credit them. She also urges the Charter Forest records were admissible to impeach Kevin's testimony that he never used CDS or was suicidal.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. La. C.E. art. 702.
The principle that questions of credibility are for the trier of fact to resolve applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Bonnette v. Conoco Inc., 2001-2767 (La.1/28/03), 837 So.2d 1219. After weighing and evaluating expert and lay testimony, the district court may accept or reject the opinion expressed by any expert. The weight given to expert testimony depends on the professional qualifications and experience of the expert and the facts upon which the opinion is based. Jones v. Jones, 38,790 (La.App. 2 Cir. 6/25/04), 877 So.2d 1061; Verret v. Verret, 34,982 (La.App. 2 Cir. 5/9/01), 786 So.2d 944.
Simply put, Kevin withheld many facts from Drs. Goldwaser and Baker, upon *597 whose reports he chiefly relies. Dr. Goldwaser's glowing assessment was based in part on a history, provided by Kevin, that he had exercised visitation for 3½ years with no significant problems; Kevin never disclosed the serious allegations of harassment and death threats which we find it unnecessary to reiterate. Dr. Goldwaser testified that during their interview, Kevin admitted using marijuana prior to his Charter Forest admission (hence the diagnosis of substance-induced mood disorder), yet at trial Kevin denied ever discussing CDS with him. Dr. Goldwaser was also unaware that Kevin had badgered Dr. Stevens to excise portions of the Charter Forest record; he admitted this was highly unusual. Kevin's omissions to Dr. Baker were similar.
By contrast, Dr. Goldwaser was aware that Kevin's trial attorney had expressed the need for "expert psychiatric witnesses who can testify that they have evaluated you and that they disagree with the conclusions reached by Dr. Williams." This sort of guidance may have informed the witness's ultimate opinion, as well as the district court's view of that opinion.
On this record, the district court was completely within its discretion to discount the opinions of Kevin's experts and to accept the conclusions of the court-appointed mental health panel.
Finally, Kevin correctly shows that the district court ruled in limine that evidence of conduct predating the joint custody consent decree would be inadmissible. Ordinarily, such evidence is not relevant to the burden of proving a change of circumstances. However, a party may examine a witness concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony. La. C.E. art. 607 C. Evidence that is otherwise irrelevant may be admissible to impeach a witness. Francois v. Norfolk Southern Corp., XXXX-XXXX (La.App. 4 Cir. 3/6/02), 812 So.2d 804. The decision to admit impeachment evidence falls within the discretion of the district court. State v. Tauzin, 38,436 (La.App. 2 Cir. 8/18/04), 880 So.2d 157. Because credibility was crucial to this highly contentious case, the district court did not abuse its discretion in considering the Charter Forest records for their impeachment value. This assignment lacks merit.

Other Issues
By his third assignment, Kevin urges the district court committed legal error in awarding sole custody to Anne-Marie, who had prayed for nothing more than a joint custody implementation plan. However, Anne-Marie clearly prayed for sole custody by her motion to supplement and amend her petition on July 25, 2003. This assignment lacks merit.
By his fourth assignment, Kevin urges the court erred in appointing another evaluator in the final judgment of October 5, 2004, after it received notice, at a pre-judgment hearing on October 1, 2004, that Dr. Sewell refused to act. At the October 1 hearing, trial counsel advised the court that Dr. Sewell was out of the country and at any rate no longer handles "legal cases." The court then named Dr. Clif Dopson in his stead, but gave counsel until the following Monday, October 4, to nominate any other psychiatrist. The record does not show that Kevin or his counsel followed up on this. Kevin now contends that the court should have accepted the report of his own psychiatrist, Dr. Anita Kablinger.
The record does not show that Kevin submitted her name as a substitute for Dr. Dopson or filed a motion to admit her report in evidence. This issue was never presented to the district court; the *598 court will not consider any issue raised for the first time on appeal. Segura v. Frank, 93-1271 (La.1/14/94), 630 So.2d 714; Cason v. Cason, 38,974 (La.App. 2 Cir. 10/27/04), 886 So.2d 628. This assignment presents nothing to review.
By this opinion, Kevin is advised that judgments awarding custody and child support are never truly final. Hansel v. Hansel, XXXX-XXXX (La.App. 4 Cir. 11/21/01), 802 So.2d 875, writ denied, XXXX-XXXX (La.3/8/02), 811 So.2d 880; Davis v. Davis, 238 La. 293, 115 So.2d 355 (1959). The instant judgment is expressly subject to modification if Kevin will be evaluated by, cooperate with and consent to treatment from Dr. Sewell. Submitting to evaluation and treatment is critical to expanding Kevin's limited visitation. If Dr. Sewell is truly unavailable, appropriate action should be taken in the trial court to appoint a substitute.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are charged to the appellant, Kevin John Cain.
AFFIRMED.
NOTES
[1] The agencies included the Louisiana State Board of Medical Examiners, Louisiana State Medical Society, American Psychiatric Association, American Society of Addiction Medicine, American Medical Association, and Louisiana Psychiatric Association. Kevin also filed an ethics complaint against Dr. Williams with the Louisiana State Board of Medical Examiners; this too was dismissed.
[2] Because the prior decree was by consent, she did not have to satisfy the "heavy" burden of Bergeron v. Bergeron, 492 So.2d 1193 (La. 1986).
[3] The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:

(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.