Judgment rendered July 17, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,693-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

ANTWAN L. WILLIAMS                    Appellant

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 22-CR-033045

Honorable Nicholas E. Gasper, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Annette F. Roach

CHARLES B. ADAMS                     Counsel for Appellee
District Attorney

EDWIN L. BLEWER, III
RHYS E. BURGESS
NANCY F. BERGER-SCHNEIDER
Assistant District Attorneys

* * * * *

Before PITMAN, STEPHENS, and THOMPSON, JJ.

**THOMPSON, J.**

Antwan L. Williams (hereinafter "Williams") was convicted by a unanimous jury of being a felon in possession of a firearm found in his vehicle during a police stop. On appeal, Williams argues that the trial court impinged upon his equal protection rights when it denied his *Batson* challenge to the State's peremptory challenges of three African American prospective jurors, and that the trial court made an erroneous evidentiary ruling excluding testimony regarding possession of the firearm. Finding appropriate the trial court's determination of race-neutral grounds supporting each of the peremptory challenges by the State, and that the court acted within its authority in excluding certain testimony, we affirm the defendant's conviction and sentence.

## FACTS

In the late evening of October 12, 2022, DeSoto Parish Sheriff Deputy Melvin Fayard was working patrol on 1-49 when he observed a white truck, which he clocked by radar at 92 mph, traveling south and overtaking other vehicles where the posted speed limit was 75 mph. Deputy Fayard turned on his sirens and lights and pursued the vehicle until the driver and his passenger pulled over. After approaching the truck, the deputy discovered three pistols inside, one of which the driver, Antwan Williams, eventually acknowledged owning. The deputy arrested Williams, a convicted felon, for possession of the firearm, and Williams was subsequently charged with two felony counts of possession of stolen firearms, in violation of La. R.S. 14:69.1(B)(1), and possession of a firearm by a convicted felon, in violation of La. R.S. 14:95.1.

Williams proceeded to a jury trial in February 2023. During *voir dire*, the State exercised peremptory challenges for three prospective jurors, all African American. Williams's defense counsel objected to the State's peremptory strikes, arguing they were made based on prospective jurors' race, in violation of the rule established in *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). The trial court heard the State's responses to defense counsel's *Batson* challenges and determined that there were sufficient race-neutral reasons for each of the State's peremptory strikes. The jury was seated, and the matter proceeded to trial.

At trial Deputy Fayard testified that on the evening he arrested Williams, he approached the driver's side of the truck and spoke with Williams. Also in the truck was a passenger, Deonta Williams (hereinafter "Deonta"), Williams's first cousin. Deputy Fayard testified that when he looked into the truck, he observed a black handle of a gun sticking out of the center console. He asked the two men to exit the vehicle, asked for their driver's licenses, and asked for permission to retrieve the firearm from the vehicle. Williams gave the deputy permission and advised him the weapon belonged to his passenger, Deonta. After securing the weapon in his unit, Deputy Fayard asked the men for the registration for the vehicle. Deonta stated it was in the glove compartment; when Deputy Fayard could not open the glove compartment, Deonta opened it for him. Inside the glove compartment was another firearm, a Glock 17 pistol. Deputy Fayard then asked Deonta if there were any other weapons in the vehicle. Deonta directed him to a third weapon located in the backseat.

Deputy Fayard secured the firearms, took them to his patrol unit, and ran a computer check in the NCIC database[1] on all three weapons. The weapon found in the center console, an FN .40 caliber, had been reported stolen in April 2022, in Natchitoches Parish. The other two weapons were not reported as stolen. When the deputy questioned the two men, both initially told him the FN .40 caliber pistol belonged to Deonta. When Deputy Fayard advised the men the weapon had been reported stolen, Deonta hesitated but still admitted that all three weapons belonged to him. As Deputy Fayard placed Deonta into his unit, he asked him where he had obtained the weapons. Deonta then told the deputy he was covering for Williams, and the FN .40 caliber belonged to Williams.

Deputy Fayard approached Williams and asked why Deonta was now saying the FN .40 caliber was his weapon. Deputy Fayard testified that Williams admitted the weapon was his and further stated that he had purchased it off the streets in Natchitoches but was not aware it was stolen. Williams was placed in handcuffs by Deputy Fayard, who advised him of his rights, and again asked him if the firearm was his. Deputy Fayard testified that Williams confirmed the gun was in fact his, and that he had bought it off the street in Natchitoches.

---

[1] NCIC is s a computerized index of missing persons and criminal information and is designed for the rapid exchange of information between criminal justice agencies. Users access the NCIC computer located at FBI headquarters through regional or state computer systems or with direct tie-ins to the NCIC computer. One common use of the NCIC system is that it allows local law enforcement agencies to make an inquiry of the database to determine if a firearm has been reported stolen in any participating jurisdiction or by any cooperating agency. A law enforcement officer can enter the serial number for a recovered firearm to determine if it has been reported as stolen in any participating jurisdiction. As recently noted by this Court, the NCIC is a trusted and well-established tool used by law enforcement. *State v. Williams*, 55,537 (La. App. 2 Cir. 2/28/24), 381 So. 3d 287, 2024 WL 821290.

Jonathan Johnson, a probation officer with the Natchitoches office of Probation and Parole, testified at trial regarding Williams's prior felony conviction. He testified that he had reviewed Williams's probation file, which indicated he was convicted of simple burglary on August 16, 2016, and was sentenced to three years' incarceration. Williams was released in February 2017 to good time parole and was ultimately released from supervision on November 15, 2018. As such, Williams's status as a convicted felon within ten years of the date of the completion of his parole prohibits him from carrying a firearm, as provided by La. R.S. 14:95.1.

Deonta, Williams's cousin, and the passenger in the truck at the time of the stop, also testified at trial. Deonta admitted he owned a Glock 17 and a "Micro Draco" pistol that were with him in the vehicle the night of Williams's arrest. He testified he and Williams had driven together to Houston earlier the day of Williams's arrest, and that he saw Williams with two handguns before their drive to Houston; one of the guns was silver and black. Deonta did not see where Williams put the guns once he entered the truck. Deonta testified that they returned to Mansfield, Louisiana, when their plans in Houston fell through.

Later that evening, the two men left Mansfield and headed toward Natchitoches, Louisiana, around 11:00 p.m. Deonta testified that during the drive, he saw one of the guns Williams had with him earlier in the day on top of the console. Deonta testified he fell asleep as Williams drove south on 1-49. Deonta woke up when Williams alerted him to police headlights behind them. Deonta testified that Williams told him to move the gun under the console. Deonta testified that the officer who pulled the vehicle over approached the driver's side window and spoke to Williams about speeding.

4

The officer said he saw a gun and asked Williams to get out of the vehicle. Deonta testified that Williams told the officer the gun belonged to Deonta. Deonta testified he decided to go along with Williams's story because he knew that Williams was a convicted felon. Deonta testified that he told the officer twice that the FN .40 caliber was his, but after he was handcuffed and placed in the police unit away from Williams, he admitted to the officer that the FN .40 caliber was Williams's, and the other two weapons belonged to him. Williams did not testify at the trial.

At the conclusion of the trial the jury returned a verdict of not guilty for possession of a stolen firearm, but guilty of possession of a firearm by a convicted felon. Both verdicts were unanimous. Williams was sentenced to the maximum sentence of 20 years at hard labor as a felon in possession of a firearm. At sentencing, the trial judge noted that Williams had been arrested fifteen times since he attained adulthood, mostly for crimes relating to thefts. A motion to reconsider his sentence was denied. Williams now appeals his conviction but does not raise as an assignment of error the length of the sentence imposed.

## DISCUSSION

Williams asserts two assignments of error.

**Assignment of Error No. 1: The trial court impinged upon Williams's equal protection rights guaranteed by the Fourteenth Amendment when it denied his *Batson* challenge to prosecutor's use of three peremptory challenges to remove minority persons from sitting as jurors in this case.**

Williams argues that the State used three peremptory challenges in a discriminatory manner to remove African Americans from sitting on the jury. Williams asserts that though one of the potential jurors, Ms. Lewis, was a distant relative, she had never met Williams and did not know whether

5

she was related to Deonta, his first cousin. Williams notes that the second prospective juror, Mr. Fuller, questioned the statute which forbids certain felony offenders from possessing or owning a firearm and stated that his brother had been convicted years earlier for indecent behavior with a juvenile. Mr. Fuller also had a brother with a pending felony charge for indecent behavior in DeSoto Parish, which he had not previously divulged during *voir dire*. The third peremptory challenge was used to remove a prospective juror, Ms. Hunter, who served on a civil jury two decades earlier and awarded money to the plaintiff. Ms. Hunter also had a cousin who had recently been sentenced for counterfeiting and theft, whom she frequently visited in jail. All three of the potential jurors stated they could serve on the jury and remain fair and impartial.

Williams asserts that the three prospective jurors were improperly removed because the race-neutral facts presented by the prosecution were insufficient. Williams argues that the mere recitation of a race-neutral reason is insufficient, and that all three potential jurors had expressed their ability to be fair and impartial. Therefore, the jurors were improperly excluded, in violation of his equal protection rights.

The U.S. Constitution forbids striking even a single prospective juror for a discriminatory purpose. *Foster v. Chatman*, 578 U.S. 488, 136 S. Ct. 1737, 195 L. Ed. 2d 1 (2016); *Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203, 170 L. Ed. 2d 175 (2008). An exercise by the state of its peremptory strikes to remove potential jurors from the venire panel solely on the basis of race violates the Equal Protection Clause of the Constitution. *Batson, supra*. *Batson* and its progeny provide a three-step process to guide courts in evaluating a claim of racial discrimination in the *voir dire* process:

6

(1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;

(2) if the requisite showing has been made, the prosecution "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result;'" and

(3) in light of the parties' submissions, the trial court must determine if the "defendant has established purposeful discrimination."

*State v. Crawford*, 14-2153 (La. 11/16/16), 218 So. 3d 13.

To establish a prima facie case, the objecting party must show: (1) the striking party's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory challenge was used to strike the venire person on account of his or her being a member of that cognizable group. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end, and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). *State v. Berry*, 51,213 (La. App. 2 Cir. 5/17/17), 221 So. 3d 967, *writ denied*, 17-1260 (La. 12/17/18), 257 So. 3d 1260.

To satisfy *Batson*'s first-step requirement for the establishment of a prima facie case of purposeful discrimination, a moving party need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *State v. Crawford*, *supra*; *State v. Elie*, 05-1569 (La. 7/10/06), 936 So. 2d 791.

When a *Batson* challenge is made, it is incumbent upon the trial judge to address the challenge, either by ruling on whether a prima facie case of

7

discriminatory intent has been made or by requiring race-neutral reasons for the strikes. *State v. Myers*, 99-1803 (La. 4/11/00), 761 So. 2d 498.

The burden of persuasion never shifts from the opponent of the strike. *State v. Crawford, supra*; *State v. Nelson*, 10-1724, 10-1726 (La. 3/13/12), 85 So. 3d 21. However, after the opponent of the strike establishes a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its use of peremptory challenges. Not until steps one and two of the *Batson* test have been satisfied is the trial court's duty under step three triggered. *State v. Crawford, supra.*

In summary, the responsibility in the three-step *Batson* test falls first on the opponent of the strike in step one, then on the proponent of the strike in step two, and lastly, on the trial court in step three. *State v. Crawford, supra.*

La. C. Cr. P. art. 795, which codifies *Batson*, provides in pertinent part:

> C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.

> D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.

E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral or gender neutral reason is given. Those jurors who have been peremptorily challenged and for whom no satisfactory racially neutral or gender neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.

The record shows that as to Ms. Lewis, the Stated provided she was a blood relative of Williams as its race-neutral reason for the challenge. Ms. Lewis stated that she did not think she would be the best fit for the jury, and she could not definitively say that she would be able to convict Williams. As to Mr. Fuller, the State provided he did not disclose that his brother was currently being prosecuted by the DeSoto Parish district attorney's office regarding sexual misconduct with children, and he expressed concern about the validity of the law prohibiting certain felons from possessing firearms as race-neutral reasons for the challenge. As to Ms. Hunter, the State provided she had a cousin being prosecuted by the DeSoto Parish District Attorney's Office, and that she was very close to her cousin, regularly visiting him in the DeSoto Parish jail, as its race-neutral reason for the challenge. The trial court heard the State's reasons on each challenge, and stated on the record that the reasons provided by the State for the peremptory challenges were race neutral and denied the challenge by Williams.

We agree with the trial court that there were clear race-neutral reasons for the challenged strikes. The record does not provide any evidence that these prospective jurors were stricken on a racial basis. Further, the record shows that the parties jointly challenged, for cause, two non-African American prospective jurors. The record shows that three African American jurors who were not challenged by the State did serve on the jury, which

9

rendered unanimous verdicts. Accordingly, this assignment of error is without merit.

**Assignment of Error No. 2: The trial court erred in denying Appellant the right to present a defense directly related to his possession or ownership of any of the three weapons found inside a vehicle he was driving, in violation of the Fourteenth Amendment.**

Williams asserts that the trial court erred by denying defense counsel the opportunity to question Deonta about an illegal Glock "switch" [2] found on his person when he was being booked into jail following the traffic stop. Williams argues that this evidence provided a motive for Deonta to change his story, after Deonta initially told Deputy Fayard that all the weapons in the car were his.

At trial, Williams's defense counsel was not permitted to discuss or question Deonta about a Glock "switch" found on his person at the jail following the traffic stop. The State objected to a question and response given by Deonta that he did not have anything illegal on him at the time of Williams's arrest. The jury was instructed to ignore the question and the response. Williams's counsel objected and argued that the response given by Deonta opened the door to offer evidence attacking his credibility, which was overruled by the trial court. Williams argues this evidentiary ruling deprived him of the opportunity to offer evidence attacking Deonta's character as a witness. Williams asserts that because Deonta alleged that Williams was in possession of a weapon, Deonta's credibility was an important factor in the case, especially since Deonta initially claimed the weapons were his. Williams argues that any evidence tending to show that

---

[2] A "switch" is the term for an after-market accessory that can be attached to the rear of a firearm to increase the speed of the semi-automatic mechanism.

10

the testimony Deonta offered was untruthful should have been admitted at trial.

Questions of relevancy and admissibility are discretion calls for the trial judge, and determinations regarding relevancy and admissibility should not be overturned absent a clear abuse of discretion. *State v. Brown*, 55,466 (La. App. 2 Cir. 3/13/24), 381 So. 3d 1007; *State v. Braden*, 55,275 (La. App. 2 Cir. 9/27/23), 372 So. 3d 900, *writ denied*, 23-01428 (La. 4/9/24), 382 So. 3d 830.

Louisiana Code of Evidence ("La. C.E.") art. 608, regarding attacking or supporting credibility by character evidence, provides in pertinent part:

> A. Reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of general reputation only, but subject to these limitations:
>
> (1) The evidence may refer only to character for truthfulness or untruthfulness.
>
> (2) A foundation must first be established that the character witness is familiar with the reputation of the witness whose credibility is in issue. The character witness shall not express his personal opinion as to the character of the witness whose credibility is in issue.
>
> (3) Inquiry into specific acts on direct examination while qualifying the character witness or otherwise is prohibited.
>
> B. Particular acts, vices, or courses of conduct. Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.

Although La. C.E. art. 607(C) permits a party to attack the credibility of a witness by examining him concerning any matter having a reasonable tendency to disprove the truthfulness of his testimony, this grant is necessarily subject to the relevancy balance of La. C.E. art. 403 and to the

11

limitation set forth in La. C.E. art. 608(B), generally precluding inquiry into particular acts, vices, or courses of conduct to attack character for truthfulness. *State v. Tauzin*, 38,436 (La. App. 2 Cir. 8/18/04), 880 So. 2d 157; *State v. Meshell,* 567 So. 2d 1181 (La. App. 3 Cir. 1990), *writ denied,* 572 So. 2d 87 (La. 1991).

Williams was on trial for possession of the firearm in the center console of the truck, which was manufactured by FN. Any testimony regarding Deonta's illegal Glock "switch" was irrelevant to Williams's possession of the FN .40 caliber in the truck at the time of the traffic stop and would serve no purpose but to confuse the jury. Further, the use of extrinsic evidence to attack a witness' credibility, aside from a criminal conviction, is specifically prohibited by La. C.E. art. 608. Williams was allowed to address Deonta's pending charges on cross-examination, which allowed the jury to consider his credibility. Accordingly, the trial court was correct in not allowing this evidence, and this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Antwan L. Williams's conviction for possession of a firearm by a convicted felon is hereby affirmed.

**AFFIRMED.**