MOORE, J.
| ¡The grandmother, Jane Willhite, appeals a judgment that denied her claim for sole custody of her 9-year-old grandson, N.W.,[1] and granted sole custody to N.W.’s mother, Rachel Willhite. We affirm.

Factual Background

Rachel was 15 years old when she got pregnant with N.W., and 16 when he was born in May 1999. She and the boy’s father, Christopher Schopp, were never married. For about a year after N.W.’s birth, Rachel and N.W. stayed with her mother, Jane, but Rachel eventually dropped out of the 10th grade, got a job at Waffle House and moved into a trailer with her older sister, Jennifer. Shortly after this, Jane moved into the trailer next door. According to Jane, Rachel moved back in for a few months after Rachel and Jennifer had an argument (Rachel did not mention this). Nevertheless, during this time Rachel provided N.W.’s daily care, including taking him to daycare while she worked, but Jane babysat many evenings and as needed.
Christopher, N.W.’s father, also exercised occasional visitation, but in 2003 Christopher’s 13-year-old brother anally raped N.W. As a result, Rachel and Jane took N.W. to the Gingerbread House for counseling, but Rachel felt this was not helping, so she quit. Christopher has been under order to pay child support ranging from $184 to $250 a month. He felt he was reasonably good about paying, but by the time of trial he was nearly $5,000 in arrears. Rachel testified that she has shouldered all the financial responsibility for raising N.W.
l2Rachel admitted pleading guilty in 2003 to possession of marijuana, but explained that this happened when someone got into her car, secretly carrying a blunt in his pocket; when the police showed up, the passenger tossed it on the floorboard. The conviction was expunged in 2004.
N.W. is described as a “difficult” child with ADHD, fits of temper and sullenness, and learning impediments.
In 2005, Rachel met a new boyfriend, Jose Cirilo Perez, a horse groomer at Louisiana Downs. This apparently alienated Rachel from her family, and from Jane in particular. Although the two women quit talking to each other, Jane heard from her son, with whom both women were still talking, that Jose “does” marijuana and ecstasy, likes to fight a lot, and probably battered Rachel because he (the son) saw bruises on her arms.
At the trailer park in early 2005, Jane called Jose a “loser” to his face; Jose reciprocated by hurling a metal child’s toy at her. Jane called the police, and Jose spent two months in jail for simple assault. (Jose also had a prior conviction for felony theft and two misdemeanor charges that were dismissed.) Shortly after this, Rachel moved out of the trailer and into a subsidized apartment on Cottonwood Street in Bossier City. She testified that Jose was not actually living with her, as this was not permitted under the lease, but admitted they may have told various people that he was.
In 2007, Jane heard that N.W. was “acting out” and had been kicked out of day *498 care for anger issues, so she brought him back to the Gingerbread House for more counseling sessions. Rachel told her to stop, as she felt the child got adequate counseling at Plantation Park, where he went to school.
lain September 2007, N.W. related a truly bizarre incident to Christopher: Jose had chased him and Rachel down the street with a carving knife; they fled to a nearby convenience store and hid behind a drink cooler; Jose threw a beer bottle at them; and when they got back home, Jose kicked the door in. Rachel denied that anything like this ever happened; she explained that N.W. sometimes “says things.” Nevertheless, Christopher filed a petition for protective order and obtained a TRO not only enjoining Rachel from harassing or contacting N.W., but granting ex parte temporary custody of N.W. to Christopher. Christopher and Jane immediately removed N.W. from Plantation Park and put him in another school, where he stayed for two weeks, until the court dissolved the TRO as a civil matter. N.W. has been with Rachel ever since.

Procedural History

Jane filed the instant petition for change of custody in October 2007. She alleged that her daughter was a high-school dropout, a menial worker, and had a string of loser boyfriends; her current boyfriend, Jose, was abusive; she refused to take N.W. to Gingerbread House; and N.W. was failing every subject in school. By contrast, she alleged, Jane could provide a wholesome environment. She asked for sole custody and child support.
In May 2008, Rachel filed a motion for sole custody, naming Christopher as defendant. Jane did not formally respond to this, but in her post trial brief she included a request for visitation should Rachel receive sole custody.
|4Before the matters came to trial, another incident occurred in June 2008. According to Jane, Rachel was not there when she (Jane) and Christopher brought N.W. back from a visit, so she called her. Rachel, however, reported a barrage of phone calls, replete with threats to call the police. Rachel filled out an application for protection from abuse and received a TRO enjoining Jane from harassing or contacting them. This also was later dismissed as a civil matter.
Rachel testified that she now works at the Kroger on Benton Road, that N.W. is finally doing better in school, and that she and Jose hope to get an apartment together soon.
Trial occurred over two days in August and September 2008. The parties testified as outlined above. There was also testimony that when N.W. was three or four years old, Rachel and her friends smoked pot and watched pornographic videos while he was around. Jane, who now lives in the Shady Grove area of Bossier City, testified that she could provide an excellent home for N.W., as she is already keeping another grandchild who is developmentally disabled.
Christopher testified as Jane’s witness, admitting that Jane “and everybody else” encouraged him to file the protective order. He also admitted falling behind in child support while serving 20 months for simple burglary of an automobile. He conceded that Rachel was a good mother, her home was alright, and N.W. was hard to control.
Also testifying for Jane were Pamela Cole, N.W.’s special ed teacher at Plantation Park, and Dr. Deborah Brown, a counselor at Gingerbread | ^House. Ms. Cole described N.W. as shy, withdrawn, angry, and a discipline problem, but a hard worker. When Ms. Cole started to relate various things N.W. had told her about his *499 home life, Rachel objected to hearsay. The district court took the matter under advisement and made the objection general, but never ruled on it.
Dr. Brown testified that she saw N.W. four times between 2003 and 2007. In August 2005, N.W. told her he wanted to run away and die, but Dr. Brown never told Rachel about this; in September 2005, he told her that Rachel and Jose fought a lot. Dr. Brown felt that N.W. needed therapy.
Rachel testified that with minimal help from Jane, she had provided virtually all of N.W.’s day-to-day care and that, considering the challenges of raising an ADHD child, she had maintained a very stable residence and employment. She felt that she should retain sole custody.

Action of the District Court

In a written opinion,[2] the district court found “some negative evidence against the mother in the past some years ago,” but focused on “the situation as it exists today.” Noting that the parent has a paramount right to custody as against a non-parent, Wood v. Beard, 290 So.2d 675 (La.1974), the court concluded that Jane had not borne the burden of proof necessary to deprive Rachel of custody of her child. It did not mention Rachel’s hearsay objection or Jane’s request for visitation.
Judgment awarding sole custody to Rachel was rendered in late December 2008. Jane has appealed, raising two assignments of error.
| (Discussion
By her first assignment of error, Jane urges the court erred in granting sole custody to Rachel. She concedes that as a grandparent, she bears the burden of proving substantial harm to the child if custody is maintained with the mother. La. C.C. art. 133; Mills v. Wilkerson, 34,694 (La.App. 2 Cir. 3/26/01), 785 So.2d 69. She summarizes the record, especially the carving knife incident, urging that Jose is a terrible influence on the child. She argues that Rachel is a bad influence, based on the testimony of Ms. Cole and Dr. Brown. She recalls that Rachel smoked pot and watched pornographic movies when N.W. was very small. Mostly, Jane criticizes Rachel’s refusal to accept help raising him, such as Jane’s offers to take care of N.W. and drive him to counseling at Gingerbread House. She concludes that Rachel and Jose are causing all of N.W.’s problems.
She also contends that the court implicitly sustained Rachel’s hearsay objection to Ms. Cole’s testimony. In child custody cases, exclusionary rules of evidence should be applied only to the extent necessary to promote the purpose of the rules. La. C. Ev. art. 1101 B(2). She also argues that under the Post-Separation Family Violence Relief Act, hearsay evidence is admissible if the witness is unavailable and the statements bear adequate indicia of reliability. Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040. She asserts that N.W.’s statements to Ms. Cole, if properly considered, would prove that he is suffering substantial harm under Rachel’s care.
17Rachel responds that the court’s award of custody is entitled to great weight and should not be disturbed absent an abuse of discretion. Havener v. Havener, 29,785 (La.App. 2 Cir. 8/20/97), 700 So.2d 533. She submits that the court properly disregarded much of Jane’s evidence: accounts of events at Rachel’s trailer four to seven years before did not reflect current conditions, and the testimony of Dr. Brown, to *500 the effect that Rachel did not care about N.W., was based on a scant two interviews occurring many years earlier. She also argues that the claims of Jose’s violent temper were never substantiated. By contrast, Rachel has maintained steady employment and is tending to N.W.’s challenging educational needs without financial help. She concludes there was no showing of substantial harm.
In a conflict between a parent and a nonparent, the parent enjoys the paramount right to custody of a child and may be deprived of such right only for compelling reasons. In re CB, 94-0755 (La.10/17/94), 643 So.2d 1251, fn. 5; Tennessee v. Campbell, 28,823 (La.App. 2 Cir. 10/30/96), 682 So.2d 1274. The award of custody to nonparents is regulated by La. C.C. art. 133:
If an award of joint custody or of sole custody to either parent would result in substantial harm to the child, the court shall award custody to another person with whom the child has been living in a wholesome and stable environment, or otherwise to any person able to prove an adequate and stable environment.
At an initial custody contest between a parent and a nonparent, the burden of proof is on the nonparent to show that granting custody to the parent would be detrimental to the child, and that the best interest of the child requires an award of custody to the nonparent. In re CB, supra.; Tennessee v. Campbell, supra. The determination of the trial judge in child custody matters is entitled to great weight and will not be disturbed on review in the absence of a clear showing of abuse. Leard v. Schenker, 2006-1116 (La.6/16/06), 931 So.2d 355; Martin v. Dupont, 32,490 (La.App. 2 Cir. 12/8/99), 748 So.2d 574.
On this record, we do not find that continuing custody with Rachel would result in substantial harm to N.W. Rachel has faced daunting challenges in life, including teenage pregnancy, limited employment options, and a child with ADHD. Despite these obstacles, she has provided a stable home and the vast majority of daily care for N.W. for over eight years. The record shows that N.W. is now making academic progress. While we cannot dismiss accounts of Rachel’s irresponsible conduct, we agree that most of this evidence is stale and does little to show that maintaining custody with Rachel would now result in substantial harm to the child. Similarly, Rachel’s current boyfriend does not, from the impassive record, shine as a paragon of responsible adulthood, but the allegations of his outlandish behavior were largely unsubstantiated. Given this record and the strong presumption of parental custody, we cannot say the district court abused its discretion.
Jane correctly shows that the court never ruled on Rachel’s hearsay objections; however, even had it overruled them and admitted the contested portions of Ms. Cole and Dr. Brown’s testimony, the court could have found this evidence none too probative. The bulk of Dr. Brown’s assessment came from two interviews with N.W. some three years prior to trial, and not | ¿really relevant to his current status. Ms. Cole’s testimony was more recent, but she amply described N.W.’s anger, low self-esteem and disruptive conduct without relating the particulars of his statements to her. Ms. Cole’s descriptions also mirror the observations of several other witnesses. A specific ruling on the objections would have been preferable, but on this record, we cannot say that it would have affected the ultimate outcome. This assignment lacks merit.
By her second assignment, Jane urges the district court erred in failing to award her any visitation. Citing La. C.C. *501 art. 136 B, she argues that because of her deep involvement in, and wholesome influence upon, N.W.’s life, she is entitled to visitation.
Rachel responds that Jane did not formally request visitation, so there was no error in failing to award it. Even if the matter had been properly presented, she adds, the nonparent has no fundamental right of visitation. Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). She concludes there was no abuse of discretion.
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleading. La. C.C.P. art. 1154. Although Jane’s petition for change of custody did not pray for visitation, she requested it in her opening statement, testified that she “definitely” wanted visitation if she did not receive custody, and argued Art. 136 in post trial brief, all without objection. The issue was properly before the court. Dufresne v. Dufresne, 08-215 (La.App. 5 Cir. 9/16/08), 992 So.2d 579, writ denied, 2008-2843 (La.12/17/08), 996 So.2d 1123.
“Under extraordinary circumstances, a relative, by blood or affinity, * * * not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child.” La. C.C. art. 136 B. This provision applies to grandparents. Lindsey v. House, 29,790 (La.App. 2 Cir. 9/24/97), 699 So.2d 1190. The award or denial of grandparent visitation under Art. 136 B will not be disturbed absent a showing of abuse of the district court’s great discretion. Id.; Evans v. Terrell, 27,615 (La.App. 2 Cir. 12/6/95), 665 So.2d 648, writ denied, 96-0387 (La.5/3/96), 672 So.2d 695.
The district court did not favor the parties (or this court) with a specific ruling giving reasons for denying visitation; however, the record is complete and supports the ruling. It is quite normal for grandparents to have a larger house and yard, and more material advantages, than young parents; these facts do not amount to “extraordinary circumstances.” The length and quality of Jane’s prior relationship with N.W. is significant, but equally notable is that Jane broke off all communication with Rachel, and that both the TROs in this case involved Jane — one of them in the exercise of visitation. The court may well have felt that a cooling-off period would be advisable after this litigation. On this record, we cannot say the district court abused its great discretion. This assignment lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. All costs are to be paid by the appellant, Jane Willhite.
AFFIRMED.

. Only the child's initials are used, pursuant to La. R.S. 46:1844 W.

. The court's opinion was not included in the appellate record, but a copy stamped “Endorsed, Filed 11-18 2008” by a deputy clerk is attached to Jane’s brief.